Junius B. Peake and Miriam M. Peake v. Commissioner.
Peake v. Commissioner
Docket No. 27637.
United States Tax Court
1951 Tax Ct. Memo LEXIS 192; 10 T.C.M. (CCH) 577; T.C.M. (RIA) 51181; June 15, 1951
William M. Sperry, II, Esq., 52 William St., New York, N. Y., for the petitioners. Charles M. Greenspan, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in the income tax of petitioners for the calendar year 1946 in the amount of $2,767.32. The sole question is whether or not the petitioners are entitled to deduct the entire amount of a loss sustained in the taxable year when a proprietary lease and stock in a cooperative apartment corporation became worthless. Findings of Fact A stipulation of facts was entered into by *193 the parties and it is adopted as part of our findings. Petitioners, husband and wife, are residents of Teaneck, New Jersey. They filed a joint Federal income tax return for the year 1946 with the collector of internal revenue for the third district of New York. On May 1, 1930, Miriam M. Peake, referred to herein as the petitioner, purchased 250 shares of capital stock of 812 Park Avenue Corporation for $30,000. The corporation had been organized to own and operate an apartment house pursuant to a so-called cooperative plan. The building was completed in 1927. At all times material herein, until September 25, 1946, the property was subject to a $1,700,000 mortgage, which had been acquired by the New York Life Insurance Company in December 1927. Ownership of the stock in the corporation carried with it the right to a "proprietary lease" of a specified apartment in the building. The lease issued to petitioner was for the unexpired term of the 99-year lease originally issued to her predecessor in 1927. The stock certificate received by petitioner incorporated by reference all the terms and conditions of the lease, and stated on its face: "This certificate is not assignable and *194 no rights shall be obtained in or to the shares represented hereby unless the terms and conditions in said indenture of Lease relating to the transfering hereof have been fulfilled. The shares represented by each certificate are transferable only as an entirety." The lease provided for a yearly rental of one dollar, as well as for periodic assessments for interest on the mortgage loan, amortization of the principal of the loan, taxes, maintenance expenses, and other charges with respect to the operation of the building. The lease contained provisions against assignment to a person approved by the holders of not less than two-thirds of the capital stock of the corporation. It also forbade a sublease without the prior consent in writing of the corporation given pursuant to a resolution adopted by a majority of the board of directors or the written consent of the holders of not less than two-thirds of the capital stock. The lease was stated to be subordinate to the mortgage lien upon the property. The petitioner and her husband moved into the apartment in August, 1930. Their son was born on February 12, 1931. In the fall of 1931 and in subsequent years petitioner listed the apartment *195 with various real estate brokers as a furnished apartment for rent for the "winter season". However, she did not in fact obtain any sublessee until the fall of 1934, when she rented the apartment for a four-month period commencing in November. Subsequent rentals were for the "winter season", usually an eight-month period beginning October 1st and ending June 1st. Petitioner did not rent the apartment during the winter seasons of 1937-1938 and 1938-1939 because of the illness of her husband. As the result of a heart attack in July 1937, he spent eleven weeks in bed, and his doctors advised against moving him from the apartment. Petitioner also did not offer the apartment for rent nor did she in fact rent it during the winter season 1945-1946, or at any time during the year 1946. The reason that petitioner did not seek a sublessee for the 1945-1946 season was that she was not satisfied with the rent ceiling applicable to her apartment, and also, since foreclosure of the mortgage seemed to be impending, she felt that she could not give a tenant assurance of possession of the apartment from October 1945 to June 1946. Before entering into any sublease the petitioner submitted the name of *196 the prospective tenant to the corporation, and received the necessary approval. The amounts of rent received, carrying charges paid, and depreciation taken by petitioner, during the calendar years 1936 to 1945, inclusive, were as follows: Deprecia-
Rent
Carrying
tion on
Year
Received
Charged
Furniture
1936
$2,375.00
$1,395.85
$2,000.00
1937
1,875.00
937.50
1,250.00
1938
None
None
None
1939
1,050.00
562.50
750.00
1940
$2,800.00
$1,500.00
$2,000.00
1941
2,875.00
1,500.00
2,000.00
1942
2,010.50
1,544.30
2,000.00
1943
3,362.50
1,640.63
2,348.68
1944
3,200.00
1,500.00
2,348.68
1945
2,000.00
937.50
1,174.84 Petitioner did not take depreciation on the leasehold. Whenever the apartment was not rented it was used as the personal residence of petitioner and her family. Her voting residence was 812 Park Avenue from the time she moved into the apartment in 1930 until she moved out in 1949. During the periods she sublet the apartment she notified the post office of the change in her mailing address. In 1933, because of financial difficulties of the corporation, the proprietary lessees obtained so-called modification *197 agreements permitting them to cancel their leases on certain conditions. The corporation had various negotiations with the New York Life Insurance Company prior to November 25, 1940, with respect to its inability to make the required payments on the mortgage. On November 4, 1940, petitioner elected to exercise the option of cancelling her proprietary lease, but she subsequently rescinded her election before the cancellation became effective. In March 1943, the corporation and the insurance company entered into a "Mortgagee in Possession Agreement". In June 1946 the insurance company began a proceeding in the Supreme Court of New York to foreclose the mortgage. On September 25, 1946, the premises were sold at public auction for an amount which was insufficient to discharge principal and interest due upon the debt secured by the mortgage. As a result petitioner lost all of her right, title and interest in the proprietary lease and her 250 shares of stock became worthless. Opinion RAUM, Judge: Petitioner claimed a $30,000 deduction on account of the loss of her investment in 1946. The respondent treated her investment as being in the 250 shares of stock, and accordingly determined *198 a deficiency by allowing her a deduction of only $1,000 as a long-term capital loss on account of the worthless stock. Petitioner does not contest the respondent's determination of deficiency if her investment is to be regarded as being in the stock of the cooperative-apartment corporation; she contends, however, that her investment was not in the stock but in the proprietary lease which she used in a rental business, and that the statutory limitations on deductions for capital losses are therefore inapplicable under Section 117(j)(2) of the Internal Revenue Code (cf. Leland Hazard, 7 T.C. 372; Solomon Wright, Jr., 9 T.C. 173). Pertinent provisions of the Internal Revenue Code applicable to the year 1946 are set forth in the margin.[1]
*199 Petitioner urges that the stock never had any value apart from the lease and that her investment was really in the lease. But while it is true that the right to obtain the lease was undoubtedly the sole reason for purchasing the stock, the fact remains that petitioner did invest $30,000 in the stock, and it is the worthlessness of that stock that must be taken into account tax-wise. It was assumed, without controversy, in at least two cases that the tax consequences from an unprofitable investment in a cooperative apartment venture, such as is here involved, must be determined upon the basis of the stock which represented the taxpayer's investment. William M. Calder, Jr., 16 T.C. 144; Bullard v. United States, 146 Fed. (2d) 386 (C.A. 2). The Commissioner's determination of deficiency herein was predicated upon the same assumption. The record supports that determination, and it must stand. However, even if it be assumed that petitioner's investment was in the proprietary lease rather than in the stock, she has not shown the Commissioner's determination to be erroneous. Apart from the question whether she was entitled to any deduction at all since she was *200 occupying the property as a personal residence for over a year prior to foreclosure (cf. Lloyd Jones, 39 B.T.A. 531, 534; W. H. Moses, 21 B.T.A. 226, 228; Regulations 111, Section 29.23(e)-1), there would still remain an insurmountable obstacle to her claim to a deduction in excess of that allowed by the Commissioner. It has been settled that where residential property is appropriated to rental purposes, the basis for computing loss on disposition cannot exceed the value of the property at the time it was devoted to income-producing purposes. Joseph F. Cullman, Jr., 16 B.T.A. 991; Warren Leslie, Sr., 6 T.C. 488, 493; Regulations 111, Section 29.23(e)-1; cf. Heiner v. Tindle, 276 U.S. 582. Although petitioner originally invested $30,000, she used the apartment as a personal residence for over four years before she actually rented it. During the period of such personal use, the proprietary lease could not be regarded as "business" property, notwithstanding that the apartment had been listed with brokers at various times. Her actual personal use of the apartment was inconsistent with any such classification. Accordingly, *201 it becomes crucial to inquire what value the proprietary lease had when it was first devoted to income-producing purposes. Since petitioner and her family occupied the apartment until November 1934, the conversion to rental purposes could not have occurred before that time, and there is no showing whatever as to the value of the proprietary lease at that time or at any later time. Indeed, the fact that the corporation was then already in financial difficulties from which it never extricated itself suggests that the lease may have had but very little value in 1934 or thereafter. Certainly, petitioner has no shown that it had a value that would have resulted in a greater deduction than respondent allowed in determining the deficiency. Nor has she shown what adjustments should be made to basis on account of depreciation up to the time of foreclosure in 1946. Section 113(b)(1)(B) of the Code calls for reduction in basis "for exhaustion * * * to the extent allowed (but not less than the amount allowable)". Although no depreciation was in fact taken on the lease, it would seem that such was "allowable" (cf. Capital City Investment Co., 4 B.T.A. 933) if petitioner is correct *202 in her contention that her investment was in the lease and that the apartment was devoted to business purposes. There may be other possible objections to petitioner's position, but we do not consider them. We conclude that she has not shown any error in respondent's determination. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or * * *
(g) Capital Losses. - (1) Limitation. - Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117. (2) Securities Becoming Worthless. - If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets. (3) Definition of Securities. - As used in this paragraph (2) of this subsection the term "securities" means (A) shares of stock in a corporation, * * *. * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. * * *
SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), * * * or real property used in the trade or business of the taxpayer; * * *
(5) Long-Term Capital Loss. - The term "long-term capital loss" means loss from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such loss is taken into account in computing net income; * * *
(b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income: * * *
50 per centum if the capital asset has been held for more than 6 months. * * *
(d) Limitation on Capital Losses. - * * *
(2) Other Taxpayers. - In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer of [or] $1,000, whichever is smaller. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * (2) General Rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph: (A) In determining under this paragraph whether gains exceed losses, the gains and losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsections (b) and (d) shall not apply. (B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.↩