LOUIS LESSER AND JEANNE LESSER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1469–62—1483–62.    Filed July 7, 1964.

---

[1] Proceedings of the following petitioners are consolidated herewith: William Malat and Ethel Malat, docket No. 1470–62; Louis Rudman and Shirley Rudman, docket No. 1471–62; Louis Lomas and Claire Lomas, docket No. 1472–62; Alvin Lesser and Carol Lesser, docket No. 1473–62; Gerald Alan Malat Trust No. 1, Louis Lesser, Jeanne Lesser, and Claire Lomas, Trustees, docket No. 1474–62; Melvin Harold Malat Trust No. 1, Louis Lesser, Jeanne Lesser, and Claire Lomas, Trustees, docket No. 1475–62; Craig Adolphe Lesser Trust No. 1, (Continued.)

*George T. Altman*, for the petitioners.
*William J. Kass*, for the respondent.

William Malat and Ethel Malat, Trustees, docket No. 1476–62; Cathy June Lesser Trust No. 1, William Malat and Ethel Malat, Trustees, docket No. 1477–62; Francine Sharon Lesser Trust No. 1, William Malat and Ethel Malat, Trustees, docket No. 1478–62; Therese Ann Lesser Trust No. 1, William Malat and Ethel Malat, Trustees, docket No. 1479–62; Craig Adolphe Lesser Trust No. 2, Louis Rudman and Shirley Rudman, Trustees, docket No. 1480–62; Cathy J. Lesser Trust No. 2, Louis Lomas and Claire Lomas, Trustees, docket No. 1481–62; Therese Ann Lesser Ford Trust No. 2, Louis Lomas and Claire Lomas, Trustees, docket No. 1482–62; and Francine S. Lesser Trust No. 2, Louis Rudman and Shirley Rudman, Trustees, docket No. 1483–62.

690

692

**OPINION**

RAUM, *Judge:* 1. *$124,148.80 Bad Debt Issue.*—A deduction for business bad debts in the amount of $124,148.80 was taken in Enterprises' return for its fiscal year ending June 30, 1958, based upon payments of $84,706.12 and $39,442.68 in fulfillment of its guarantee of Universal's obligations in respect of the Marysville and San Bruno projects. The Commissioner's disallowance of the deduction was in substance on the sole ground that the loss had not yet occurred during that year. At the trial the Commissioner conceded that the loss was sustained in that year, but argued that it resulted from a "nonbusiness" rather than a "business" debt, the deduction of which is limited by reason of section 166(d)(1)(B) of the 1954 Code.[2] Thus, the sole issue, and the only one that we decide, in respect of this item is whether the loss, conceded to arise from a "debt," is to be classified as "business" or "nonbusiness."

---

[2] SEC. 166. BAD DEBTS.

    (d) NONBUSINESS DEBTS.—

        (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

     \*       \*       \*       \*       \*       \*       \*

        (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

Section 166(d)(2) defines "nonbusiness debt" as follows:

(d) NONBUSINESS DEBTS.—

\*          \*          \*          \*          \*          \*          \*

(2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

   (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

   (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

We hold that the two components of the $124,148.80 item were plainly "business" bad debts.

A significant aspect of Enterprises' business was the development of subdivisions, building houses on the lots thereof, and selling the individual houses and lots. It conducted such business through partnerships, and, in this instance, in an equal partnership with Bauer Construction Co., Inc., known as Bauer-Lesser. That partnership was to receive 70 percent of the net profits derived from constructing and selling houses on land owned by Universal Construction Co., Inc. And it was in connection with the two parcels of real estate owned by Universal, known as the Marysville and San Bruno projects, that Enterprises sustained the losses here in issue. Its guarantees of Universal's obligations giving rise to those losses were directly connected with its business of constructing and selling houses (through the partnership of Bauer-Lesser), and those losses must therefore be classified as "business," wholly apart from Enterprises' further and more remote interest in the venture as a stockholder of Universal. Cf. *Whipple* v. *Commissioner*, 373 U.S. 193, 204–205; *Wilfred J. Funk*, 35 T.C. 42, 49, acq. 1961–2 C.B. 4; *George P. Weddle*, 39 T.C. 493, 498, affirmed 325 F. 2d 849 (C.A. 2); *Eugene H. Rietzke*, 40 T.C. 443, 450–451; *J. T. Dorminey*, 26 T.C. 940, 945.

2. *$187,000 Bad Debt Issue.*—In its return for the fiscal year ending June 30, 1959, Enterprises claimed a bad debt deduction in the amount of $187,000. The Commissioner did not challenge the propriety of the deduction in general, but he reduced it by $62,074.40 on the ground that to this extent the deduction claimed was a duplication of a bad debt deduction taken for the preceding year.

There can be no serious doubt that the $187,000 deduction was based upon Enterprises' $374,000 payment on Republic's $450,000 note, as set forth in our findings, and reflected the coguarantor's or coguarantors' obligation to reimburse Enterprises for his or their one-half share of that payment,[3] an obligation which had become worthless by the close of the fiscal year ending June 30, 1959. But it is equally

---

[3] Enterprises' returns show large losses sustained by it in connection with the various Bauer enterprises, and we must assume, in the absence of evidence to the contrary, that its own one-half share of the foregoing payment was taken into account in the computations resulting in those losses that were thus deducted on the returns.

clear that the $374,000 payment covered the $124,148.80 bad debt deduction which had been claimed for the preceding tax year, and which we have approved in 1, *supra*. Accordingly, the Commissioner correctly determined that since the $124,148.80 deducted as a bad debt in the fiscal year ending June 30, 1958, was included in the $374,000, and since one-half of $374,000, or $187,000, was claimed as a business bad debt loss in the fiscal year 1959, the duplicated item of one-half of $124,148.80, or $62,074.40, should be disallowed as a deduction in the latter year.

Petitioners' attempt to prove that the $124,148.80 was not included in the $374,000 was weak and unsatisfying. They had the burden of proof and in this they have utterly failed. Moreover, the evidence as a whole, including the book entry upon the basis of which the deduction was claimed, strongly refutes petitioners' position.[4]

Apparently realizing the weakness of their position that there was no duplication once it is assumed that the $187,000 bad debt deduction was itself based upon the $374,000 payment, petitioners at the trial offered some testimony to prove that the $187,000 claimed as a bad debt deduction was not related to the $374,000 payment at all, but was based on other debts the payments of which had been guaranteed by Enterprises and Bruce Bauer and his associates. And on brief counsel virtually abandoned the position that there was no duplication, arguing instead that "Even though the method used in determining the deduction involves a clear duplication, * * * the full deduction taken is allowable if, as a matter of fact, there was a loss during the year in the full amount deducted." There are two complete answers to this new position.

In the first place, the evidence produced does not convince us that the necessary underlying facts have been established. The presentation of evidence on this issue was marked by confusion, vagueness, and generalities. Throughout the trial we were continually groping for orientation in a thick fog, and we repeatedly called counsel's attention to the difficulties of comprehension generated by his method of developing the record. Notwithstanding our repeated suggestions to him, both on and off the record, to present his materials in a clear and meaningful manner, the record in respect of this issue is in a most unsatisfactory state. While there was some general testimony that might furnish a basis for counsel's present contention, we find it wholly unconvincing in the context of the record as a whole, and in the absence of a more precise foundation. To be sure, there was general testimony that Enterprises' bad debts were even greater, by

---

[4] Indeed, the evidence persuasively indicates that Enterprises' accountant who made the $187,000 entry regarded the $124,148.80 item as being identified with the $374,000 payment, and although that accountant was in the courtroom, petitioners failed to call him as a witness.

$25,000, than the $187,000 claimed in its 1959 return. However, the components of these figures were never disclosed; nor was any evidence presented showing just how these figures were derived. Precisely what were the debts that added up to these figures? The record furnishes no clue, and we have no confidence in the bland conclusory assurances of the witnesses who asserted in general terms that there were bad debts in an aggregate amount which exceeded the claimed $187,000 by $25,000. We were left with these and other troubling doubts that were never resolved, and we received no assistance in this respect from petitioners' inadequate brief. In the circumstances we cannot in good conscience make any such finding as requested of us by counsel to the effect that Enterprises sustained bad debt losses in its fiscal year 1959 in an aggregate amount equal to at least $187,000 that was wholly unrelated to its $374,000 payment to Republic.

In the second place, no such alternative issue as counsel presses upon us was raised by the pleadings. Rule 7(c) (4) (B) of our Rules of Practice requires that the petition contain:

4. Clear and concise assignments of each and every error which the petitioner alleges to have been committed by the Commissioner in the determination of the deficiency. * * *

5. Clear and concise lettered statements of the facts upon which the petitioner relies as sustaining the assignments of error, * * *

These are not empty or meaningless requirements, and they are to be taken seriously. Compliance with these provisions is essential to the orderly conduct of the litigation.

The only assignments of error that relate in any way to this item are as follows:[5]

g) The Commissioner erred in increasing the income of the partnership Louis Lesser Enterprises, Ltd., by the sum of $62,074.40, in respect of an item referred to as bad debts.

h) The Commissioner erred in failing instead to decrease the income of the said partnership by the sum of $62,851.20, being the excess of $187,000.00 (half of the sum of $374,000.00 referred to in paragraph 5(c) below) over the said sum of $124,148.80 referred to in subparagraph (a) above.

The only allegations of fact that in any way relate either to the $124,148.80 bad debt deduction for fiscal 1958 or to the $187,000 bad debt deduction for fiscal 1959 are, in their entirety, as follows:

5. In support of the foregoing assignments of error, petitioners allege the following facts:

a) The sums deducted by the partnership Louis Lesser Enterprises, Ltd., as payments made because of guarantees to a bank represent actual payments made by the said partnership in the years in which deducted. Although loans were made from the same bank in part for that purpose the loans were made in the

---

[5] These assignments and other references to or quotations from the pleadings are taken from docket No. 1469–62. Substantially identical language appears in the other dockets which involve this item.

same manner as if made at another bank and in the same manner as if made for another purpose or purposes, and the funds when paid on the guarantees were the partnership's funds.

b) The said guarantees were made in the regular course of the trade or business of the said partnership; the debts resulting therefrom were created in connection with the trade or business of the said partnership; and the loss from the worthlessness of said debts was incurred in the said partnership's trade or business.

c) In the year ended in 1959 the partnership Louis Lesser Enterprises, Ltd., paid a total of $374,000.00 on said guarantees.

Nowhere in the foregoing are there any "clear and concise * * * statements of the facts upon which the petitioner[s] rel[y] * * *" as supporting their claim to deduct a bad debt of $187,000, unreduced by the Commissioner's adjustment of $62,074.40. Nor is any theory spelled out upon the basis of which they contend the Commissioner was in error. At most there is merely the allegation that Enterprises paid a total of $374,000 on the guarantees in the taxable fiscal year 1959. But the Commissioner's determination accepted that fact as true; he merely went further and eliminated therefrom that portion of the deduction which in his view duplicated a deduction taken in the previous year. Accordingly, petitioners could have challenged that determination either by alleging facts showing the absence of duplication or by taking a new affirmative position alleging facts establishing that the full $187,000 was deductible in fiscal 1959 for reasons unrelated to the $374,000 payment and regardless of whether there was any duplication. They did neither, and no such latter new issue is in any way reasonably inferable from the pleadings. Moreover, even though the Court in its discretion could grant permission to amend the pleadings during the course of the trial to conform to the proof (see Rule 17(d), Tax Court Rules of Practice), no request therefor was made in respect of this issue, and we would not in any event grant that permission in these cases in order to raise such a distinctly different issue, where the pleadings were so inadequate, slipshod, and slippery in the first place, and where the alleged "proof" was so vague and unsatisfactory. Cf. *Nathan Goldsmith*, 31 T.C. 56, 63–64.

3. *Mitchell Property.*—This issue relates to the gain realized by Enterprises in its fiscal year ending June 30, 1958, from the sale of the Mitchell property, and whether that gain is taxable as ordinary income or capital gain. Under section 1221 of the Internal Revenue Code of 1954,[6] the property sold qualifies as a "capital asset," the gain

---

[6] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

from the sale of which is taxable as capital gain, unless it is excluded from the definition of that term because it constitutes property held primarily for sale to customers in the ordinary course of the trade or business of Enterprises. The question presented is one of fact. After carefully considering the purpose of Enterprises in acquiring and holding the property, the time it held the property, its inactivity with respect to its sale, the nature of its business, and all other pertinent evidence, we have reached the conclusion, and found as a fact, that the Mitchell property was not held by Enterprises primarily for sale to customers in the ordinary course of its business. Respondent erred, therefore, in treating the gain from the sale as ordinary income and not as capital gain.

4. *Depreciation—Helipot Building.*—Industrial computed its deduction for depreciation on the Helipot building for the fiscal year ending June 30, 1959, using the declining balance method, upon the basis of a 25-year life from date of acquisition. The Commissioner determined that the building had a useful life of 50 years and revised the deduction accordingly. The burden was upon petitioners to establish that a "reasonable allowance" [7] for depreciation on the building should be based upon an estimated life of not more than 25 years.

In support of their position petitioners urge, first, that the life of a building may be based upon a composite of all its components, taking into account not only the "shell" but also such other items as heating, plumbing, air-conditioning, electric wiring, etc., and that such composite life would not exceed 20 years in the case of the Helipot building. Second, they argue that Industrial bought the property only because it had Hughes' commitment for a 20-year lease which alone returned its entire investment to it, that the Helipot building was a unique, single-purpose building, and that it therefore had no useful life beyond the basic 20-year term of the lease.

---

[7] Sec. 167 of the 1954 Code provides:

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * *

(1) of property used in the trade or business, or

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b) USE OF CERTAIN METHODS AND RATES.—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a), shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

(1) the straight line method,

(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),

(3) the sum of the years-digits method, and

(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2),

The second contention may be briefly dismissed. We are satisfied by the evidence that the property was not a unique, single-purpose building, and that the termination of the basic 20-year term of the Hughes lease would not put an end to its useful life, wholly apart from the six renewal options of 5 years each which contemplated further occupancy of up to 30 additional years by Hughes beyond the 20-year basic term. And the mere fact that those who controlled Industrial were so fortunate, or had such business acumen, as to couple their acquisition of the property with so favorable a lease from Hughes that would pay off the entire purchase price and return a handsome profit as well during 20 years, is hardly a reason to conclude that the building had a useful life of only 20 years.

Nor are we convinced by petitioners' effort to prove that the life of the building, based upon all its components, was only about 20 years. Their position is founded largely upon the testimony of Estil R. McCollum, the general manager of the construction company that did the remodeling of the building for Hughes after it became lessee. Upon the basis of that testimony petitioners argue that the "shell" of the building, consisting of the masonry, steel, iron, walls, roof, etc., comprised 40 percent in value of the structure acquired by Industrial and had a life of 40 years, and that the remaining 60 percent in value of the building, composed of electrical work, plumbing, heating, air-conditioning, luminous ceilings, etc., had a life of only 10 to 15 years. We are by no means ready to accept these figures. We heard McCollum's testimony, and received the definite impression that he was shading it in petitioners' favor.

As to the basic structure of the building, which petitioners disparagingly refer to as the "shell," we reject the conclusion that it had a life of only 40 years. McCollum admitted that the "basic shell of the building * * * is of a long-life nature, very permanent masonry-type of a building," and that it was "very substantial." When asked how long a life it would have, he replied "40, 60 years." We do not accept at face value his subsequent testimony putting a limit of even less than 40 years' life for the basic structure. Our own evaluation of the record leads us to a conclusion that it was much closer to 60 years.

Moreover, we do not accept as accurate that the basic structure, or "shell," represented only 40 percent of the cost of the building to Industrial. Of course, Industrial did not buy separate components of the building; it purchased a unified structure. And if there is to be any allocation of the purchase price among the various elements that go to make up the total structure it must be based upon their relative values at the time of acquisition by Industrial. No evidence

was presented in this respect as of the date of purchase. True, a schedule was received in evidence indicating the cost of the various components of the building to Industrial's predecessor somewhat more than a year before. But, in the context of the record before us, those figures appear to furnish a highly unreliable index of relative values at the time the property was purchased by Industrial. The evidence shows that during the comparatively brief period between the construction of the building by Industrial's predecessor and the purchase by Industrial some of the interior components had been subjected to considerable abuse. Also, some of the components such as the electrical work, plumbing, and air conditioning had become badly deteriorated because of corrosion due to the salt air from the nearby ocean.

In the circumstances, the comparative value of all such components in relation to the basic structure of the building obviously was considerably less than at the time of original construction; and, concomitantly, even if the basic structure represented only 40 percent of the total cost of construction, it reflected far more than 40 percent of the price *thereafter* paid by Industrial that was allocable *by it* to the building as a whole. Yet, though petitioners would take into account the deteriorated condition and lower remaining lives of the various components, apart from the "shell," they do not consistently allocate the necessarily resulting increased proportionate cost to the basic structure which is a vital factor in determining any composite life.

A further element militating against petitioners' position is the fact that at the time Industrial purchased the building it had already entered into the lease agreement with Hughes, and undoubtedly understood at that time that as a result of Hughes' extensive program of enlarging and remodeling the building a number of the interior components of the building would be torn out regardless of condition. And the rule has long been established that where one purchases property with intention of demolishing or removing a structure, that portion of the purchase price otherwise allocable to the demolished part must be treated as allocated to the remaining property. Cf. *Blumenfeld Enterprises*, 23 T.C. 665, 670, affirmed 232 F. 2d 396 (C.A. 9); *Lynchburg National Bank & Trust Co.*, 20 T.C. 670, 673–674, affirmed on another ground 208 F. 2d 757 (C.A. 4); *Hillside National Bank*, 35 T.C. 879; *N. W. Ayer & Son, Inc.*, 17 T.C. 631, 635. Accordingly, to the extent that it was contemplated at the time of acquisition of the building in this case that some components would be torn out, such components would not have any basis allocable to

them nor would it be proper to take into account any theoretical remaining useful lives in respect of them.

The matter before us is not susceptible of any precise mathematical solution. The problem is one of judgment upon the basis of the entire record, taking into account the probable useful life of the building as a whole, and giving proper consideration to the condition of any of the components that may affect the composite life of the entire structure. Doing the best we can with the materials at hand, in the light of the discussion above, we have concluded and hereby find as a fact that the remaining useful life of the Helipot building when acquired by Industrial was 45 years.

*Decisions will be entered under Rule 50.*