Gerald C. Smith and Olga E. Smith v. Commissioner.
Smith v. Commissioner
Docket No. 2269-65.
United States Tax Court
T.C. Memo 1966-247; 1966 Tax Ct. Memo LEXIS 37; 25 T.C.M. (CCH) 1266; T.C.M. (RIA) 66247; November 2, 1966
Gerald C. Smith, pro se, for the petitioners. * Charles B. Tetrick, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1958, 1959, and 1960 in the amounts of $615.20, $725.52, and $570.26, respectively, and by amended answer claimed for the calendar year 1960 an increased deficiency of $30.10, making a total deficiency in issue for that year of $600.36. The issue for decision is whether for the calendar years 1958 and 1959 amounts paid to petitioner Gerald C. Smith under the designation, "Per Diem," are includable *38 in petitioners' gross income, and if so whether all or any portion of the amounts so includable is deductible by petitioners in computing their taxable income, and whether for the calendar year 1960 all or any portion of the amount received by petitioner Gerald C. Smith under the designation, "Per Diem," which petitioners included in their gross income is deductible in computing petitioners' taxable income. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in St. Charles, Missouri, filed joint Federal income tax returns for the calendar years 1958 and 1959 witht the district director of internal revenue at Los Angeles, California, and they filed a joint Federal income tax return for the calendar year 1960 with the district director of internal revenue at St. Louis, Missouri. Gerald C. Smith (hereinafter referred to as petitioner) was employed by McDonnell Aircraft Corporation (hereinafter referred to as McDonnell) on April 8, 1957, as a field procurement representative, and continued to be employed as a field procurement representative by McDonnell through 1961. Petitioner is still employed by McDonnell. *39 McDonnell is a corporation engaged primarily in the research, development, and production of airplanes, missiles, and space craft. Its operations are conducted through various divisions including engineering, production, purchasing and procurement, and fiscal and personnel. The engineering division designs, tests, and develops airborne weapons; the production division produces the weapons ordered from McDonnell; the purchasing and procurement division acquires materials required by the production division; and the fiscal and personnel division does the record keeping and employment for McDonnell. The engineering division conducts its research and designs and produces prototypes of missiles in St. Louis, Missouri. In the performance of its contracts with the United States Government, McDonnell has personnel stationed away from St. Louis in other cities of the United States and in foreign countries at subcontractors' plants and at Government installations for a variety of purposes such as material procurement, quality control, testing, and instruction. The duties of petitioner's position with McDonnell were the subject of a salary job description of McDonnell for the position entitled, *40 "Field Procurement Representative." Petitioner's job description provided that under the direction of assigned supervision, he would coordinate the activities of McDonnell's suppliers through visits at their facilities to insure compliance with contracts. This was followed by a more detailed description of petitioner's duties and responsibilities and of the knowledge required for the position. Practically speaking, petitioner's work involved visiting suppliers with whom McDonnell had contracts for material to work with or assist them when a problem arose in the supplier's operation in supplying material to McDonnell, which the responsible personnel at McDonnell felt required some assistance or investigation of the cause of the difficulty. A high percentage of McDonnell's business is derived from contracts with the United States Government and during the years here involved McDonnell was engaged in the performance of various contracts with the United States Air Force, United States Navy, and United States Aeronautics and Space Admininistration. All of these contracts contained standard provisions relative to reimbursement by the Government to McDonnell of allowable costs for travel *41 and per diem of employees. Because of the high percentage of McDonnell's business which is derived from Government contracts, most of the costs incurred by McDonnell are charged to Government contracts in one form or another. McDonnell formulated and submitted control procedures on travel and relocation policy and on special field assignment to Government contracting officers for approval. In the event a contracting officer failed to approve a control procedure, McDonnell revised and corrected the proposed procedure to make it acceptable. McDonnell's Control Procedure 20.100 entitled, "Travel and Relocation - Policy," and Control Procedure 20.103 entitled, "Travel - Special Field Assignment," were in force during the years here in issue. These control procedures had the approval of the appropriate contracting officers. Minor revisions were made to these procedures subsequent to the date of their original issuance on January 1, 1955, but the substance of the procedures remained the same from the date of issuance throughout the years here involved. Control Procedure 20.103 applied to those employees of McDonnell who were on a special field assignment at a single location away *42 from St. Louis for any period ranging from 30 days (later revised to 60 days) to 9 months, but extensions of the original assignment period could be made. For allowable contract costs under Control Procedure 20.103, McDonnell was reimbursed by the Government for employee per diem living allowances at a rate of $10. Control Procedure 20.101 entitled, "Travel - Domestic" was used when a McDonnell employee made a trip of a duration of less than 30 days (later extended to 60 days on September 14, 1960). Trips made under Control Procedure 20.101 were generally for a period of one or two weeks. Under this control procedure, the employee was paid his actual transportation and lodging cots and in addition $8 per day. Shortly after petitioner was employed by McDonnell in April of 1957, he began to travel for short periods to various places in the continental United States where factories of McDonnell's suppliers were located. The travel was originally done under travel and relocation authority issued under Control Procedure 20.101, and the duration of the trips ranged from a few days to two or three weeks. The authorization issued to petitioner for these trips carried a designation of the *43 purpose of the trip such as "To investigate purchase orders and shipping delays." Most of the trips made by petitioner during the year 1957 were from St. Louis to Los Angeles or San Francisco, California, although petitioner did make a few trips to other spots such as Fort Worth, Texas, and Wichita, Kansas. During January 1958, petitioner made trips of short duration from St. Louis to New York City, Elizabeth, New Jersey, and Philadelphia, Pennsylvania, as well as a trip to Los Angeles, California, in connection with his work at McDonnell, and in February 1958 he made trips from St. Louis, Missouri, to Los Angeles, California. In accordance with the provisions of Control Procedure 20.101, petitioner was paid his traveling expense, lodging expense, and $8 per day while on these trips. On March 17, 1958, petitioner was assigned to Los Angeles, California, under Control Procedure 20.103 and the purpose of the trip was designated as "Special Field Assignment Under C.P.20.103." The original travel assignment designated a period from March 17, 1958 to June 30, 1958 and authorized the use of petitioner's personal car for travel to official destination plus use for company business and authorized *44 travel expense for petitioner's wife and two children. On or about March 17, 1958, petitioner, his wife and two children departed from St. Louis, Missouri, for Los Angeles, California. They went by automobile taking with them their clothing, personal effects, and some bedding. They took no furniture or household furnishings with them. On March 10, 1958, prior to leaving St. Louis, petitioner closed out a checking account which he had with the bank in St. Louis and did not reopen this account until August 23, 1960. Petitioners' children had been attending schools in St. Louis, Missouri, prior to March 17, 1958, and they were removed from these schools and commenced attending schools in Los Angeles after their arrival there in March 1958. Petitioner did not vote in either St. Louis or Los Angeles during the years here involved. Petitioner continued to use Missouri tags on his personal automobile in 1958 and 1959. In late 1959 petitioner purchased a new automobile in Los Angeles which was financed through a branch of the Bank of America in Los Angeles. He purchased 1960 California tags for the new automobile. Also, petitioners from the time of their arrival in Los Angeles through approximately *45 mid-August 1966 maintained a checking account in a bank in Los Angeles, California. Prior to leaving St. Louis in March of 1958, petitioner rented his furnished house in Affton, Missouri, in which he and his family had been residing to Mary Bell Trees for a rental of $125 per month, Mary Trees paying for all utilities. Petitioner paid the real estate taxes and repairs on the house. Petitioner and Mary Bell Trees had no written lease, but petitioner informed her that she could expect to have the house for at least 90 days, and possibly as long as a year or a year and a half. Petitioner and Mary Trees also agreed that petitioner would telephone her to give her notice that he wanted repossession of his house and would try to give a month or two months' advance notice. Petitioner at no time requested that the house in Affton, Missouri, be vacated by Mary Trees until August 1960. In August 1960, he telephoned Mary Trees to inform her that he expected to return to St. Louis and wanted her to vacate the house. Mary Trees was able to vacate petitioner's house within a week or 10 days after receiving petitioner's message. Petitioner left his household furnishings as well as certain personal *46 items such as fishing tackle and some toys of his children's in the house in Affton, Missouri, which he and his family had occupied prior to going to Los Angeles. Upon arrival in Los Angeles in March 1958, petitioner rented a furnished apartment for himself and his family in that city at a rental of $125 per month. Petitioner lived with his family in this apartment for approximately 6 months and then rented another apartment in Los Angeles at a monthly rental of $135, where he and his family lived until sometime in August 1960. Petitioner and his family attended and contributed to a church in Los Angeles, California, during the period from mid-March 1958 through mid-August 1960. On June 9, 1958, petitioner's travel and relocation authority was revised to extend the date to July 15, 1958; on July 11, 1958, it was revised to extend the date to August 15, 1958; and on August 14, 1958, it was revised to extend the date to November 14, 1958. This travel and relocation authority was again revised on November 10, 1958, to extend the period to January 1, 1959. This revision carried the notation, "Originally assigned to Los Angeles Area 3-17-58." On December 19, 1958, a travel and relocation *47 authority was issued to petitioner for a period from December 15, 1958, to June 15, 1959, with the explanation "Extension of assignment beyond nine months." In connection with the issuance of this authority, petitioner's immediate superior at McDonnell, Norman A. Myers, addressed a memorandum to other officials of McDonnell in which he stated in part: The necessity for this request is due to the vast amount of business placed with West coast suppliers. Enclosure (1), covering Mr. G. C. Smith, was issued in order that transportation costs could be kept to a minimum. If Mr. Smith were to travel under C.P. 20.101, which covers our other Field Procurement Representatives, this would necessitate his returning to the St. Louis office at least every thirty days. This round trip is considered unnecessary, and consequently C.P. 20.103 is being used. There were subsequent extensions of petitioner's travel and relocation authority to August 31, 1959, to March 1, 1960, to August 1, 1960, and a final extension from August 1, 1960 to September 1, 1960. In connection with the extension of petitioner's travel and relocation authority from March 1, 1960 to August 1, 1960, an interoffice memorandum *48 between officials of McDonnell stated in part, "Every effort will be made to return Mr. Smith to St. Louis after the termination of this request," and in connection with the request for extension from August 1, 1960 to September 1, 1960, a similar interoffice memorandum stated in part, "We feel certain Mr. Smith will be able to return to St. Louis after the termination of this request." At the time petitioner began working for McDonnell and through the year 1960 Norman A. Myers, Assistant Purchasing Agent, was petitioner's immediate superior. At the time petitioner was sent to Los Angeles under Control Procedure 20.103, Myers understood that although petitioner's authorization was for a period of approximately 90 days it was indeterminate how long he would be in Los Angeles, but it was Myers' understanding that petitioner would be there as long as McDonnell's work required him to stay. This might extend to a period of 2 years or 5 years or even longer. In March 1958 there were two other McDonnell employees doing approximately the same type of work as petitioner in Los Angeles. One of these employees was permanently stationed in Los Angeles by McDonnell, and the other employee who *49 was in Los Angeles was there under Control Procedure 20.103. When McDonnell permanently transferred an employee from St. Louis to a place such as Los Angeles, such employee was given a salary increase and his household furnishings and effects were moved to his new location at the expense of McDonnell. Under usual circumstances if such employee were transferred back to St. Louis, he would no longer receive the increased salary allowed him because of being stationed in a region such as Los Angeles. The McDonnell employee doing procurement work similar to that done by petitioner, who was stationed in Los Angeles under Control Procedure 20.103 at the time petitioner was sent to Los Angeles under the same control procedure, had been in Los Angeles since December 1956. Los Angeles was in 1958, had been for sometime, and has continued to be one of the areas with a large source of supplies of defense products needed by McDonnell. During the years here in issue McDonnell had approximately 1,000 vendors and subcontractors in Los Angeles and the number of suppliers and volume of procurement activity in that area has increased from 1958 through the present time. On June 30, 1958, the other *50 McDonnell employee who was doing procurement work in Los Angeles assigned there under Control Procedure 20.103 left the employment of McDonnell and for a while petitioner was the only employee doing procurement work there who was under this control procedure. At the date of the trial of this case McDonnell had approximately 25 employees doing procurement work in the Los Angeles area. Petitioner actually remained in Los Angeles under Control Procedure 20.103 from March 17, 1958 through August 20, 1960, and during this period he was paid a $10 per day living allowance, private automobile expenses, and telephone expenses. There was no restriction placed on the use which petitioner was to make of the $10 per diem allowance. Petitioner generally used his apartment in Los Angeles to receive business telephone calls and would leave from his apartment and drive by automobile to visit various suppliers of McDonnell, sometimes seeing from three to six suppliers in one day. Petitioner drove on these visits to suppliers in his personally owned automobile and during the period March 17, 1958 to November 14, 1958 was paid a mileage allowance by McDonnell of 7 cents a mile, and from November 15, 1958 through *51 the remainder of his stay in Los Angeles, he was paid a mileage allowance of 8 cents per mile. The distance petitioner drove in one day varied, and sometimes he would drive as much as 125 to 140 miles in one day. During the time he was in Los Angeles, the mileage driven per day for the days that he visited plants of vendors of McDonnell averaged approximately 50 miles. During the time petitioner was in Los Angeles, he returned for one three-day period to St. Louis, Missouri. He left Los Angeles for St. Louis on June 20, 1959, and remained in St. Louis on business for McDonnell through June 22, 1959. This trip was covered by Control Procedure 20.101 entitled, "Travel - Domestic" and for this three-day stay petitioner received his transportation and lodging costs and $8 per diem. Also, while petitioner was in Los Angeles under Control Procedure 20.103, he made a number of trips from Los Angeles to San Francisco, California. On two of these trips, one in February and one in March 1959, petitioner remained over night in San Francisco. On the other trips petitioner would leave around 7:00 or 8:00 o'clock in the morning and return to Los Angeles the same afternoon or evening, sometimes *52 as early as 2:00 to 4:00 o'clock and generally around 7:00 to 9:00 o'clock. Petitioner made at least three such one-day trips in 1958, seven in 1959, and nine in 1960. During the entire time petitioner was in Los Angeles, petitioner submitted to McDonnell weekly travel expense reports showing the per diem allowance which usually was $10, the automobile and telephone expense, and any other additional expense incurred during the week for which he was entitled to reimbursement from McDonnell such as an occasional public transportation charge or car rental charge. Generally, the airline tickets which he used to fly between San Francisco and Los Angeles were charged directly to McDonnell and a notation of "script" or some similar notation for the reference to the transportation costs on airlines would be made on petitioner's weekly travel expense report. Control Procedure 20.103 carried a provision for trips away from the points where a McDonnell employee was assigned under that control procedure and provided for his reimbursement under such circumstances of actual transportation and lodging costs in addition to his receipt of his regular $10 per day allowance. Petitioner ate many of *53 his meals while in Los Angeles in the apartments in which he lived with his wife and two children. Sometimes he would not eat breakfast in the apartment and generally he would be away at lunchtime and on occasions he would take the vendors of McDonnell whom he was visiting to lunch. Sometimes he would not return home in time for dinner and would buy dinner on his way returning from the last vendor he had visited. Sometimes when petitioner went on one-day trips to San Francisco, he would not have breakfast until he arrived in San Francisco. On these trips he generally had lunch in San Francisco and sometimes had dinner before returning from San Francisco. From March 17, 1958 through the end of that year petitioner received a total of $2,860 as per diem living allowance from McDonnell of which at least $30 was with respect to days when petitioner was on trips to San Francisco. During 1959 petitioner received a total of $3,414 as per diem living allowance from McDonnell of which at least $110 was for days when he was on trips to San Francisco and $24 represented the living allowance in addition to payment for transportation and lodging for the 3 days he was in St. Louis. For the period *54 January 1 to August 20, 1960 petitioner received a total of $3,310 as per diem living allowance from McDonnell of which at least $90 was received for days when he was on trips to San Francisco. When petitioner returned to St. Louis on or about August 20, 1960, he and his family resumed residence in their home in Affton, Missouri which had been rented to Mary Bell Trees while he was in Los Angeles, and petitioner reopened the checking account in the same bank in St. Louis, Missouri in which he had had an account prior to March 17, 1958. The work petitioner had been doing in Los Angeles was not concluded at the time petitioner returned to St. Louis but was taken over by another McDonnell employee who was in Los Angeles. Respondent increased petitioners' income as reported on their returns by the amounts of $3,222, $3,640, and $2,384 for the calendar years 1958, 1959, and 1960, with the explanation in the first 2 years of "Per diem allowance" and in the year 1960 of "Per diem and travel allowance." For each of the years respondent explained his adjustment with the statement that the amount had been received by petitioner from his employer as a per diem allowance during the year, *55 and further stated: It is held that such allowance is includible in your gross income and that you are not entitled to any offsetting deductions for travel, meals, or lodging expenses because you have not established the amounts expended for such purposes or that you were away from home in the pursuit of a trade or business. * * * Ultimate Facts 1. It was known to petitioner when he was assigned to Los Angeles that he might be stationed there for a long time. 2. Petitioner's assignment to Los Angeles was for an indefinite period. Opinion Petitioner did not include the amounts he received in 1958 and 1959 as per diem allowance in his income for the respective years. It is not clear whether he now contends that the amounts of the per diem allowances are not includable in income or is relying completely on his contention that he is entitled, under the provisions of section 162(a)(2) of the Internal Revenue Code of 1954, to a deduction of the entire amount of per diem allowance paid him. We held Leo C. Cockrell, 38 T.C. 470 (1962), affd. 321 F. 2d 504 (C.A. 8, 1963), that the $10 per diem amount paid to a McDonnell employee *56 under Control Procedure 20.103 was includable in the employee's income. The factual situation with respect to the receipt of the payment is no different in the instant case from that in the Cockrell case, and therefore, on the basis of the Cockrell case we hold that the per diem allowance payments received by petitioner are includable in his income. The major argument between the parties in the instant case centers on whether petitioner is entitled to the deduction of all or any portion of the amounts he received as per diem allowances as travel expenses while away from home in the pursuit of a trade or business. Petitioner's primary position is that St. Louis was his home, that he was not permanently transferred to Los Angeles and therefore he was away from home when he was in Los Angeles. He does not contend that he has specifically proven the amount he expended for food in Los Angeles but apparently asks that we assume that his expenses for food and lodging must have been in excess of the $70 a week per diem allowance he received. Petitioner has shown the total amount of rental for the apartment for himself and his wife and two children but does not specifically argue to what *57 extent he considers he has shown he had lodging expenses in Los Angeles. Respondent's primary position is that petitioner was on an indefinite, as distinguished from temporary, assignment to Los Angeles, that he was not "away from home" for income tax purposes while he was in Los Angeles, and that he is not entitled to deduct the cost of his meals and lodging while in Los Angeles. In Peurifoy v. Commissioner, 358 U.S. 59 (1958), the Court concluded that the evidence supported a finding that the employment of the taxpayer there involved at the place at which he made expenditures for meals and lodging which he sought to deduct was indefinite as distinguished from temporary, and affirmed the lower court's holding disallowing the deduction claimed by the taxpayer. In other cases, some of them dealing specifically with employees of McDonnell paid per diem allowances under McDonnell's Control Procedure 20.103, this and other courts have considered whether the taxpayer assigned to a location away from the home office of his employer was on an indefinite or temporary assignment. In Leo C. Cockrell, supra; Kalist v. Commissioner, 321 F. 2d 508 (C. *58 A. 8, 1963), affirming a Memorandum Opinion of this Court; and Filler v. Commissioner, 321 F. 2d 900 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court, each dealing with employees of McDonnell, the conclusion was reached that the taxpayer's employment at a station away from St. Louis was indefinite and not temporary, and therefore, no deduction was allowed to any one of those taxpayers for travel expenses while away from home in the pursuit of a trade or business. In Doyle v. Commissioner, 354 F. 2d 480 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court, it was held that a taxpayer employed at a place for a period which he knew would be of long duration was not entitled to a deduction for traveling expenses under section 162(a)(2). In the Doyle case the Circuit Court stressed the fact that the taxpayer had not moved his wife to his place of employment for personal and not business reasons. In the instant case the taxpayer did move his family to Los Angeles. The cases we have referred to and many others held that a taxpayer assigned away from the home office of his employer for an indefinite period which he knows will be of reasonably *59 long duration is not entitled to a deduction for travel expenses while away from home for amounts spent at such location. Numerous criteria have been used to determine whether a taxpayer is "away from home" within the meaning of section 162(a)(2). The question is primarily one of fact. Josette J. F. Verrier Friedman, 37 T.C. 539 (1961). In some instances, as in Doyle v. Commissioner, supra, it may be concluded that an originally temporary stay became, during some particular tax year or before the beginning of a particular tax year, one which was not temporary. See also Leo M. Verner, 39 T.C. 749 (1963), and Floyd Garlock, 34 T.C. 611, 616 (1960). Weighing all the facts in the instant case, we have concluded that when petitioner was assigned to California he knew that he might be employed there for a long period of time and that his employment in Los Angeles was indefinite and not temporary. Although he was sent to Los Angeles under an authorization providing for a stay of approximately 90 days, it was understood by his employer, his superior, and petitioner that he would not necessarily return to St. Louis at the end of that period *60 if his services were needed in Los Angeles. It was understood by all concerned that petitioner would be in Los Angeles as long as the work necessitated his being there. Petitioner's superior specifically testified that he considered petitioner's stay in Los Angeles to be indefinite and for as long as McDonnell needed his services there, and petitioner's action showed that he understood his stay to be indefinite and of reasonably long duration. The information petitioner gave to the tenant of the house he owned in Affton, Missouri was that she could have the house for 90 days and possibly a year, a year and a half, or more. This shows that petitioner considered his stay in Los Angeles to be indefinite and he knew it might extend over a year and a half or longer. Petitioner stresses the fact that he did not move his furniture from St. Louis to Los Angeles. The determination of the location of a person's home is not controlled by where he leaves his furniture. This Court and others have considered a taxpayer's home to be, for the purposes of section 162(a)(2) of the Internal Revenue Code, his principal place of employment. Robert A. Coerver, 36 T.C. 252 (1961), *61 affirmed 297 F. 2d 837 (C.A. 3, 1962); Joseph M. Winn, 32 T.C. 220 (1959); O'Toole v. Commissioner, 243 F. 2d 302 (C.A. 2, 1958), affirming a Memorandum Opinion of this Court. Other courts have considered a taxpayer's home to be the principal place of abode of the taxpayer and his family although a deduction for travel expenses while "away from home" has been denied to such a taxpayer if for personal reasons as distinguished from the "exigencies of business" he maintains his home away from the location at which he is employed for an indefinite period which he knows may be of long duration. See Wright v. Hartsell, 305 F. 2d 221 (C.A. 9, 1962); and James v. United States, 308 F. 2d 204 (C.A. 9, 1962). Under either meaning of "home" as used in section 162(a)(2), petitioner's home during the years here in issue was in Los Angeles. United States v. Mathews, 332 F. 2d 91 (C.A. 9, 1964). The principal place of abode of petitioner and his family, as well as petitioner's principal place of employment was Los Angeles. The facts that we have set forth in our findings show that petitioner treated Los Angeles as his home. *62 He closed his St. Louis bank account and opened one in Los Angeles. His children attended Los Angeles schools. We will not repeat all the detailed facts we have set forth which form the basis of our conclusion that petitioner's assignment in Los Angeles was indefinite as distinguished from temporary, that petitioner knew when he received the assignment that it would be of a reasonably long duration, and that petitioner is not entitled to deduct his expenses in Los Angeles as travel expenses while away from home in the pursuit of a trade or business. The evidence does not show the amount expended by petitioner for meals and lodging while in Los Angeles, but some estimate, weighing heavily against petitioner, of the amount of such expenditures might be made from the record, were petitioner entitled to any deduction for his expenses of meals and lodging in Los Angeles. The record shows that the amounts received by petitioner as mileage payments because of use of his personal automobile were not included by petitioner in his income and not deducted, except that in one instance a small amount which was not included in income was deducted by petitioner and the parties have agreed to *63 an adjustment in this respect by stipulation. Therefore, the travel expenses of a business nature incurred by petitioner because of his use of his automobile to travel from the plant of one McDonnell vendor to the plant of another such vendor are not here in issue. Petitioner does contend in the alternative that he is entitled to deduct the expenses of his trips to San Francisco and the one trip to St. Louis. With respect to all of the trips, except the two overnight trips to San Francisco and the one trip to St. Louis, respondent argues that petitioner is entitled to no deduction because he was not away from home overnight. With respect to the trip to St. Louis in 1959 and the two trips to San Francisco on which petitioner stayed overnight, respondent argues that even though petitioner would be entitled to a deduction for the amounts actually expended, he has failed to prove the amount of his expenditures and for that reason has failed to prove that any amount is deductible. In William A. Bagley, 46 T.C. 176 (1966), on appeal (C.A. 1, Aug. 3, 1966), we held that in line with Hanson v. Commissioner, 298 F. 2d 391 (C.A. 8, 1962), reversing 35 T.C. 413 (1963); *64 Williams v. Patterson, 286 F. 2d 333 (C.A. 5, 1961); and Chandler v. Commissioner, 226 F. 2d 467 (C.A. 1, 1955), reversing 23 T.C. 653 (1955), we would "no longer follow the overnight rule as an absolute guide in every situation." Respondent in the instant case argues that our decision in William A. Bagley, supra, as well as the decision of the Circuit Court in Hanson v. Commissioner, supra, is not in accordance with the law as indicated by the legislative history of section 162(a)(2) of the Internal Revenue Code of 1954, and urges that in the instant case we follow his rulings holding that the cost of meals is not deductible as traveling expense unless incurred on a trip that takes a taxpayer away from home overnight. For the reasons expressed in William A. Bagley, supra, we no longer will consider the overnight rule as a rule of thumb in determining whether traveling expenses are deductible. From the facts in the record in the instant case, and considering the distance between Los Angeles and San Francisco, we conclude that on the days petitioner was in San Francisco he was away *65 from home in the pursuit of his trade or business. See Kenneth Waters, 12 T.C. 414, 416, 417 (1949). The record does not show with preciseness the amount which petitioner expended for meals while away from home in San Francisco and St. Louis in the pursuit of his trade or business. Petitioner gave some general testimony about his expenditures but no testimony as to the exact amounts expended. However, considering the testimony, generally, we have concluded that the $8 paid to petitioner for each day in St. Louis, totaling $24, is a reasonable estimate for his expenses while in St. Louis away from his home in Los Angeles above his transportation and lodging which was paid for by McDonnell, and that for the two trips on which petitioner stayed overnight in San Francisco $8 for each trip, or a total of $16 is a reasonable estimate of his expenditures not specifically paid for by McDonnell. For the remaining oneday trips which petitioner made to San Francisco and considering the hours petitioner left Los Angeles for San Francisco and the hours he returned, we have concluded, even weighing heavily against petitioner because of the lack of preciseness of the evidence, that *66 $5 for each trip is a reasonable estimate of his expenditures for meals while away from home on these trips, and therefore for expenses of these trips petitioner is entitled to a deduction of $15 in 1958, $35 in 1959, and $45 in 1960. Petitioner finally argues that a portion of the per diem allowance he received was used in entertaining subcontractors of McDonnell and for expenses of an apartment in which he and his family lived but which he also used as his office in carrying on his trade or business. Petitioner contends that if his position that the entire per diem allowance is deductible is not sustained, that portion allocable to office rental for carrying on a trade or business and to entertainment should be allowed. The pleadings in the instant case raise no issue with respect to allowable business expenses for office use of petitioner's apartment or for entertainment. Therefore, this issue is one not raised by the pleadings but is one raised for the first time on brief and is not properly before the Court. See Louis Lesser, 42 T.C. 688 (1964), affirmed 352 F. 2d 789 (C.A. 9, 1965). Even if this issue were properly raised, there is no proof to support *67 petitioner's claim. The testimony shows that petitioner was not required by McDonnell to do any entertaining. Petitioner testified that he sometimes took subcontractors to lunch but offered no evidence to show that this was reasonably necessary in his employment by McDonnell. That McDonnell did not consider it necessary is shown by the testimony of McDonnell's employees in supervisory positions that petitioner was not expected or required to do any entertaining. The record shows that petitioner was reimbursed weekly by McDonnell for telephone expense and there is no indication that this amount of reimbursement was included by petitioner in any year here in issue in his gross income. Petitioner has totally failed to show that he incurred any other expense in his home for space devoted to work for his employer, McDonnell. Therefore, even had petitioner properly raised the issue as to a deduction of business expenses for office space and entertaining, we would not sustain his contention because of the total failure of proof on his part. Decision will be entered under Rule 50. Footnotes
*. On reply brief: Myron E. Sildon.↩