John M. BRILEY and Dorothy D. Briley, Plaintiffs

v.

UNITED STATES of America, Defendant.

Civ. A. No. 7702.

United States District Court
N. D. Ohio, W. D.

Nov. 7, 1960.

Rehearing Denied Jan. 3, 1961.

John B. Spitzer, Marshal, Melhorn, Bloch & Belt, Toledo, Ohio, for plaintiffs.

Russell E. Ake, U. S. Atty., Cleveland, Ohio, Carl LaRue, Asst. U. S. Atty., Toledo, Ohio, for defendant.

KALBFLEISCH, District Judge.

This is an action under 28 U.S.C.A. 1346(a) (1) for the recovery of Federal income taxes alleged to have been erroneously or illegally assessed and collected from plaintiffs for the year 1951.

On December 11, 1944, plaintiff John M. Briley entered into a 99-year "proprietary lease" with One East End Avenue Corporation (hereinafter referred to as Corporation) for a penthouse apartment. At the time the lease was executed said plaintiff agreed to purchase seven hundred shares of a total of thirteen thousand issued shares of stock in the

Corporation at $1.08 per share and to pay a pro rata share of the annual operating expenses of the Corporation not to exceed $10 per share. Plaintiff also agreed to buy three hundred additional shares at $1.08 per share on demand of the Corporation at a date not prior to June 30, 1949, or to vacate his apartment and forfeit his seven hundred shares.

The Corporation levied an assessment of $10 per share on plaintiff's stock on January 15, 1946, which plaintiff paid and has classified as an additional cost of his stock. (Briley Affidavit, Para. 3.)

Plaintiffs lived in the apartment from 1944 to June, 1949, when they moved to a home which they had purchased in Rye, N. Y. Prior to March, 1949, plaintiffs listed the apartment for sale with brokers and sometime later made efforts to rent, as well as to sell, the apartment. When plaintiffs left they took with them all of their personal belongings and never thereafter re-occupied the premises as a residence.

On November 23, 1949, the Corporation notified plaintiff Briley that it was exercising its option to require him either to purchase three hundred more shares of stock, thereby raising the maximum rental for the apartment to $10,000 per year, or to forfeit his lease and shares. After negotiation, the Corporation gave up this right, the plaintiff agreeing to pay rent in the amount of $10,000 per year for three years beginning October 1, 1950, and further agreeing that in the event he should assign the lease and sell the stock before the expiration of the three-year period he would make a lump sum payment to the Corporation in an amount equal to the difference between $10,000 per year and the amount of rent payable on the basis of the assignee's ownership of seven hundred shares of stock for the balance of the three-year period. (Agreement, March 30, 1950, Ex. N.) Plaintiff paid the increased monthly rental beginning October 1, 1950, and on March 21, 1951, assigned the lease and his seven hundred shares of stock to a third person, Alexandra Creel, for $5,000. Thereafter he paid the Corporation the sum of $7,875, the amount required by the March 30, 1950, agreement. Plaintiff claimed expenses for the sale in the amount of $623.49 for a net realization of $4,376.51 on the transaction. Plaintiff also claims to have spent $2,080.71 to improve the property during his occupancy although there is no evidence as to the time and nature of such improvements.

The purchaser of plaintiff's lease and stock had no obligation to purchase additional stock and the rental was to be computed solely on the basis of the ownership of seven hundred shares. (Complaint, Para. 16. Answer, Para. 16.)

1.

The plaintiffs contend that the lease and shares of stock in the apartment constituted property held for the production of income in 1951 and that the rent paid during that year, in the amount of $2,625.00, and the lump sum payment of $7,875 were deductible as ordinary and necessary expenses of management, conservation and maintenance under Section 23(a)(2) of the Internal Revenue Code in effect in 1951. 26 U.S.C.A. § 23(a)(2) and 26 U.S.C.A.Int.Rev.Acts beginning 1940, Rev.Act of 1942, § 121.

In his affidavit in support of his motion, plaintiff Briley states that prior to March, 1949, plaintiff listed the apartment for sale with various real estate firms and brokers. The affidavit refers to a number of exhibits submitted with plaintiffs' motion, consisting of sample copies of letters to brokers listing the apartment for sale, together with lists of the brokers' names to whom such letters were sent. These exhibits, and paragraph 7 of the affidavit, indicate that on March 14, 1949, plaintiff listed his apartment for sale with ten brokers; by letters dated May 3, 1949, plaintiff advised the same brokers that the apartment was still available; on June 15, 1949, plaintiff wrote the same brokers that he was vacating the apartment on June 24th and that he was willing to consider a lesser selling price than stated at the time of the listing; follow-up letters to the same

brokers were sent on August 30, 1949, and on December 28, 1949. On January 18, 1950, plaintiff sent letters to some twenty-eight brokers advising that the apartment was still unsold, these letters suggesting that his price may have been too high and stating that he would be interested in any reasonable offer. In letters dated May 8, 1950, to the twenty-eight brokers, plaintiff indicated a willingness to rent or sell the apartment and stated that in order "to stir up more interest" he would discuss commissions "substantially in excess of the regular custom." (Ex. J.) On February 26, 1951, plaintiff reminded the same brokers of the availability of his apartment for sale or rental and that he would consider any reasonable offer. In addition to listing his apartment with brokers, plaintiff wrote to a number of individuals offering his apartment for sale or rental and ran classified advertisements in Fort Worth, Houston, Dallas and New York City newspapers. (Ex. L; Briley Affidavit, Para. 9.)

The Government does not take issue with any of the foregoing facts but asserts that plaintiffs were merely attempting to sell a personal residence and that such efforts do not serve to convert it into an income-producing property entitling the owner to expense deductions.

Section 23(a) (2) of the Internal Revenue Code, as amended by Section 121(a) of the Revenue Act of 1942 (26 U.S.C.A. § 23(a) (2) and 26 U.S.C.A.Int.Rev.Acts beginning 1940), provided deductions from gross income as follows:

> "In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

The Government cites Rumsey v. Commissioner, 2 Cir., 1936, 82 F.2d 158 wherein the Court held that the petitioner could not deduct wharfage expenses and loss on the sale of a houseboat formerly used as his residence and not occu-

pied by the petitioner after it was listed for sale with brokers. In that case the deductions had been sought under the Revenue Act of 1928 (26 U.S.C.A.Int. Rev.Acts 1924–1939), Section 23(a), as expenses incurred by individuals in carrying on trade or business, and Section 23(e) (2) which permitted deductions:

> "if incurred in any transaction entered into for profit, though not connected with the trade or business."

The principles of the Rumsey case do not apply here because Section 23, as then in effect, contained no provision equivalent to Section 23(a) (2), applicable in 1951, which permitted deductions for expenses incurred in connection with property held for the production of income but not necessarily acquired for profit.

Robinson v. Commissioner, 3 Cir., 1943, 134 F.2d 168, was first considered under Section 23(e) (2). In that case the petitioner lived in a family residence and, after inheriting another property, moved her family there and listed the former residence for sale or rent with a real estate agent. The property was unoccupied for about two years and petitioner claimed deductions for depreciation and maintenance, under Section 23 of the Revenue Act of 1936. The Circuit Court upheld the Board of Tax Appeals' disallowance of such deductions on the ground that the property had not been appropriated to business use. However, the Court remanded the case to the Tax Court so that it might consider the applicability of Section 23 of the Code, as amended, and which had been made retroactive by the Revenue Act of 1942. The case was reconsidered by the Tax Court, Robinson v. Commissioner, 1943, 2 T.C. 305, and, in an opinion reviewed by that Court, it held that the amended statute required allowance of deductions for maintenance and depreciation. The Court said that property formerly constituting a residence no longer need be converted into business property to allow deductions for expenses and that the property involved had been appropriated

to income-producing purposes by the taxpayer's affirmative actions in abandoning it as a residence and listing it with two real estate firms which had made diligent efforts to sell or rent it but had succeeded in renting only the garage.

This Court is of the opinion that the second Robinson decision is correct and is applicable to the facts of this case.

Leslie v. Commissioner, 6 T.C. 488, relied on by the Government, involved a house abandoned and offered for sale because it had been made uninhabitable by a hurricane. With two judges dissenting, the Court held that "for administrative purposes the necessity of some unmistakable act of conversion or appropriation is obvious" (Page 494), and it apparently felt that the facts there did not support such a conclusion. Neave v. Commissioner, 1952, 17 T.C. 1237, also cited by the Government, is not applicable here. In that case the taxpayer left his residence because he was called into military service and never re-occupied it. It was listed for sale and sold about two years later, but during that time the taxpayer left most of his furniture in the house, making it possible for him to return there and live, and the taxpayer and his wife did not acquire another residence until about the time the first one was sold. The Court concluded that the evidence was insufficient to show that the petitioner had intended to convert his property from residential to income-producing use during the applicable period.

Jones et al. v. Commissioner, 1954, 22 T.C. 407, is cited by the Government, but appears to support the plaintiffs' position. There, a former summer residence was abandoned in 1946. It was listed for sale from January, 1945, through 1948. It was listed for rent in 1947 and was rented that summer and in subsequent years. The litigation involved petitioners' claim for deduction of maintenance and upkeep expenses on their former residence as property held for income during the entire year 1947. The Commissioner had allowed such deduction only for the period beginning July 1, 1947, when the property was first rented. The Court held that the petitioners were entitled to the deduction for the entire year under Section 23(a) (2). The opinion, which was reviewed by the Court, pointed out that the mere listing of the property for sale, without more, would not have been sufficient evidence that the property was being held for the production of income, but that when this was coupled with proof that the property had been abandoned for residential use by petitioners, that it was unsuitable for year-round residence, and that it was rented in July, 1947, and thereafter, then by such proof petitioners had established the conversion of the property to income-producing purposes for all years subsequent to 1946. The Court held that expenditures made prior to receipt of rental income in 1947 were chargeable against such income and qualified as amounts paid or incurred for the management, conservation or maintenance of property held for the production of income.

The Government also cites Ritter v. Commissioner, 6 Cir., 1947, 163 F.2d 1019, affirming, *per curiam*, a decision of the Tax Court (1946 P-H T.C. Memorandum Decisions, Par. 46236). In that case the taxpayer had purchased a 42 ft. cabin cruiser early in 1937 but was dissatisfied with it and almost immediately offered it for sale through a broker. The cruiser was not sold until 1943 or 1944 and the taxpayer sought to deduct repair and maintenance expenses from 1937 to 1944. The Tax Court affirmed the Commissioner's disallowance of the deductions, distinguishing Robinson v. Commissioner, supra, on the ground that in that case part of the property (the garage) had been rented. Obviously the Court was of the opinion that the taxpayer had failed to sustain the burden of proof that there had been an appropriation to income-producing purposes, a task more difficult in the case of a boat which would be subject to personal use by the owner at irregular intervals at any time prior to sale.

As the Tax Court pointed out in the Robinson case, the appropriate statute

and regulations do not require that property held for income necessarily be currently productive or that there be any likelihood that it will be sold at a profit (Page 308). Nor is it required that a' taxpayer show an appropriation of his former residence to income-producing purposes by an "irrevocable act," as the Government contends. (Brief of United States, p. 15.)

The undisputed facts in this case being that the taxpayers and their family moved out of the apartment in June, 1949, and into a house which he had purchased, that all of their personal property was removed at that time, that the premises were never thereafter re-occupied by them as a residence, and that diligent efforts were made to sell or rent the apartment, the Court is of the opinion that the property in question had ceased to be the taxpayers' residence and was property held for the production of income during the year 1951, within the meaning of Section 23(a) (2) of the Code.

The next question is the correctness of plaintiff's claim that his rent and lump sum payments in 1951 constituted deductible expenses. When the Corporation exercised its option on November 23, 1949 (Ex. M), requiring plaintiff to purchase three hundred additional shares of stock or forfeit his lease and the shares which he already owned, he had already vacated the apartment but had been unsuccessful in disposing of it. Under the circumstances the parties apparently found it to their mutual advantage to modify their December 11, 1944, agreement. (Ex. A.) The new agreement, dated March 30, 1950 (Ex. N), cancelled the earlier contract (Ex. A), thereby relieving plaintiff of the obligation of purchasing the additional shares, and amended the terms of the lease so that plaintiff would be required to pay additional rent for a three-year period beginning October 1, 1950, as if he owned one thousand shares of stock. The Government contends that the amount of the increase in rent paid by plaintiff for the first three months of 1951 and the lump sum payment were expenditures which:

"* * * were capital in nature and not currently deductible. By reason of these expenditures, the corporation relinquished its right to terminate the taxpayer's lease and cause the surrender of its shares, thereby substantially increasing the taxpayer's ownership rights in each of these assets." Brief of United States, page 7.

The facts do not support this assertion. The relinquishment of the Corporation's right to terminate plaintiff's lease and cause surrender of his seven hundred shares of stock was not in consideration for plaintiff's agreement to pay a higher rent for three years but followed, as a matter of course, from the agreement of the parties to terminate their December 11, 1944 contract (Ex. A) upon a mutual exchange of consideration (Ex. N). Plaintiff's retention of the lease and shares, resulting in the Corporation's continuing to receive rent for the apartment, was the benefit and consideration which it received under the new agreement. Under the old agreement, had plaintiff elected not to forfeit his lease and shares, he or his assignees would have been obliged to pay a maximum of $10,000 per year rent not merely for three years but for the balance of the term of the lease, then about ninety-three years. The agreement to pay $3,000 per year more rent for three years, therefore, was not a new or additional obligation undertaken by plaintiff, hence not a capital expenditure to obtain the removal of an unfavorable provision or obligation of a lease. The total increased rent paid by plaintiff for the period of his ownership of the lease during 1951 should therefore be treated as an ordinary and necessary expense under Section 23(a) (2).

The lump sum payment to the Corporation upon plaintiff's assignment of the lease and stock on March 21, 1951, represented the amount of the increase in rental plaintiff had agreed to pay for the

balance of the three-year period which began October 1, 1950, and was, in effect, a partial advance payment of rent for the benefit of plaintiff's assignee. This payment, being allocable to the period after assignment of the lease and shares, clearly was not deductible as a maintenance expense. Neither was it an expense as consideration for relief from an unfavorable contractual provision or cancellation of a lease, as urged by plaintiffs, for the reasons stated above.

### 2.

The parties are also at issue over plaintiff's position that he is entitled to claim a net long term capital loss on the sale of his lease and seven hundred shares of stock.

The Government contends (Brief of United States, p. 19), and the plaintiffs concede, that "a long term capital loss should be allowed only if the transaction was entered into for profit, in accordance with the requirements of Section 23(e) (2)" of the Code (Plaintiffs' Reply Memorandum, p. 7). This section provides for deductions for losses (as distinguished from expenses) by individuals:

> "(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *".

Plaintiffs claim that since the stock represented an equity interest in the entire building it follows that "the shares were originally acquired in a 'transaction entered into for profit.'" (Plaintiff's Reply Memorandum, p. 7.)

The purchase of the seven hundred shares of stock in 1944 (out of a total issue of thirteen thousand) was required by the terms of plaintiff's proprietary lease. Plaintiff paid a nominal price of $1.08 per share, his total investment in the stock, therefore, being equivalent to about one month's rent. There is no evidence that any dividends on the stock were ever paid or expected. The rent payable by the tenants was based on the number of shares of stock which they held. (Briley Affidavit, Para. 1.) It is

reasonable to infer that the amount of stock held reflected the value, or cost of maintenance, of the plaintiffs' suite in proportion to the entire apartment building. Clearly, the stock acquisition was merely incidental to plaintiffs' leasing of the apartment as a residence and any loss incurred was personal and not part of a transaction entered into for profit. Stewart v. Commissioner, 1946 P-H T.C. Memorandum Decisions, paragraph 46,-077; Calder v. Commissioner, 1951, 16 T.C. 144.

Peake v. Commissioner, 10 T.C.M. 577 (1951), cited by plaintiff, was significantly different from the case under consideration. There the taxpayers had paid a substantial amount of money ($30,000) for stock in a cooperative apartment and had sublet their suite during some winter seasons. On these facts the Commissioner determined that the purchase of the stock had been a transaction entered into for profit and had allowed a maximum deduction of $1,000 as a capital loss when it was sold. The litigation was over the taxpayers' theory that the investment was in the lease used in the business of renting, rather than in the stock, and therefore not subject to the limitation on deductions for capital losses.

As the evidence in this case does not support a conclusion that plaintiff's purchase of the stock and lease constituted a transaction entered into for profit, no deduction for a capital loss may be allowed.

There being no issue as to any material facts herein, the disposition of the motions of each of the parties for summary judgment will be as follows:

1. Plaintiffs' motion will be sustained as to their claim that the subject property was held for the production of income in 1951 and that the total rent paid during that year, for a period covering approximately three months, to the date of assignment of the lease and stock, was deductible as an ordinary expense under Section 23(a) (2). Plaintiffs' motion will be overruled in all other respects.

2. Defendant's motion will be overruled insofar as the judgment requested is inconsistent with that portion of plaintiffs' motion which has been sustained in the preceding paragraph, but will be sustained in all other respects.