GEORGE W. MITCHELL AND MARIE J. MITCHELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1141–65. Filed November 15, 1966.

*George Gump*, *Howard H. Conaway*, and *Arnold E. Kaufman*, for the petitioners.

*George K. Dunham*, for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax for the calendar years 1960 and 1961 in the amounts of $3,447.73 and $21,823.53, respectively. Since petitioners are not contesting an adjustment in each year for entertainment and travel expense of $1,200, deducted by petitioners on their returns, the entire deficiencies are not in controversy. The issues presented for our decision are: (1) Whether a joint venture, in which petitioner George W. Mitchell had a 40-percent interest, was entitled to report the gain on the sale in 1961 of the property known as Old Sinai Hospital as gain from the sale of a capital asset; and (2) whether the joint venture was entitled to depreciate the said property during the period the said joint venture held the property.

FINDINGS OF FACT

Some of the facts were stipulated, whereupon the stipulation is incorporated herein by reference.

Petitioners [1] are husband and wife residing in Baltimore, Md. They filed their joint income tax returns for the calendar years 1960 and 1961 with the district director of internal revenue, Baltimore, Md.

During the years involved herein petitioner was president of Lloyd E. Mitchell, Inc., a mechanical and acoustical contracting company.

On June 24, 1959, petitioner had luncheon with Clarence Elderkin, Newell Cox, and Sidney Blumenthal. Elderkin was president of Consolidated Engineering Co., which is one of the largest contractors in the East. Elderkin died in 1963. Cox was executive vice president of Consolidated Engineering Co. Cox died in 1965. Petitioner had known both Cox and Elderkin for 35 years. Blumenthal was a member of the board of Sinai Hospital in Baltimore.

---

[1] Marie J. Mitchell is a petitioner herein by reason of the filing of joint returns with her husband. Unless otherwise indicated, George W. Mitchell will hereinafter be referred to as petitioner.

After luncheon Blumenthal asked petitioner if he was going to attend the auction of the property known as Old Sinai Hospital, hereinafter sometimes referred to as the property, whereupon petitioner responded in the negative. The property was to be auctioned that afternoon, June 24, 1959, at 2 p.m. After additional discussion, petitioner accompanied Blumenthal to the auction.

The bidding at the sale began around $500,000. Petitioner did not begin to bid for the property until the bidding price had reached $600,000. Petitioner began to bid because he felt that the price was low and that, if he could get the property within this price range, it would make a good investment.

Petitioner's bid of $708,000 was high bid and the property was sold to him.

At the conclusion of the bidding, a group of four, who were the next highest bidders, approached petitioner and inquired as to whether he was interested in selling the property and what profit he would take for it. Petitioner stated that he was not interested in selling the property at that time.

Petitioner did not attend the auction with the aim of bidding for the Old Sinai Hospital.

After the auction petitioner went to see Elderkin and Cox at their offices at Consolidated Engineering Co. Petitioner informed them of his purchase and offered to allow Elderkin and Cox to have an interest in the property. Elderkin and Cox accepted the offer and thereafter petitioner, Elderkin, and Cox entered into a joint venture in which petitioner and Elderkin each took a 40-percent interest and Cox a 20-percent interest.

Title to the property was taken in the names of the three joint venturers.

This venture was the only venture or partnership ever entered into by petitioner with either Elderkin or Cox or both of them.

Shortly after the purchase of the property, the joint venturers visited the property and took steps to protect it from vandalism.

The joint venturers had discussions among themselves as to how to put the property to its best use.

A few days after the auction petitioner was contacted by telephone by Frank Morreno, who was a prominent doctor and president of the park board in Baltimore. Morreno requested petitioner to make a gift of the property to the City of Baltimore. Petitioner told Morreno he would have to discuss the matter with Elderkin and Cox as they were part owners of the property. Morreno called again the next day and inquired of petitioner whether the latter would talk with R. Walter Graham, Jr., who at one time was a practicing physician in Baltimore and who then was comptroller of the City of Baltimore.

Through the efforts of Morreno, Graham and petitioner arranged to have a conference in Graham's office to discuss the property. A meeting was held in Graham's office attended by petitioner, Morreno, Graham, and petitioner's attorney. At this meeting Graham inquired of petitioner if he would be willing to sell the property to the City of Baltimore at cost.

If the City of Baltimore purchased the property, settlement could not take place for at least a year due to the City's lack of funds for this purpose.

After some discussion, it was agreed that a figure of $750,000 would represent the joint venturers' cost, i.e., the auction price, plus out-of-pocket expenses incurred and to be incurred from date of purchase to the date of settlement for maintenance and protection of the property, legal and accounting fees, etc.

Petitioner informed Graham and Morreno that he would have to discuss this offer with Elderkin and Cox.

The next day, at the request of Graham, another meeting was held in Graham's office. At this meeting, Graham and others attending put "pressure" on petitioner to sell the property to the City of Baltimore at cost as a matter of civic duty.

Petitioner offered to sell the property to the City of Baltimore for $750,000, the figure arrived at as representing the joint venturers' cost of the property.

On July 15, 1959, petitioner, through his attorney, wrote a letter to the board of estimates of the City of Baltimore withdrawing his offer to sell the property to the city.

After the deal with the city was off, the joint venture began to follow up the numerous inquiries they were receiving concerning the property. One inquiry was made by a person named Swimmer who wanted the joint venturers to build a motor-hotel on the property and lease it to him. This possibility was thoroughly explored by the joint venturers with estimates being made. After several months of exploration, it was finally decided that Swimmer did not have the necessary financing for such a project.

Norman Labowitz, representing New York interests, approached petitioner with the idea of converting the main building of the property into an old-age home. This possibility was also thoroughly explored, with estimates being prepared and protracted negotiations covering a period of 4 months. Labowitz proposed to rent the property from the joint venturers for a term of 10 years and obtain the needed financing from the FHA to make the necessary improvements in the property. This deal did not materialize when Labowitz could not obtain the FHA financing.

Throughout the time the above negotiations were going on, the joint venturers also explored the possibility of converting the main building of the property into offices for doctors and utilizing a smaller building as a home for nurses.

These two possibilities were explored fully since the property was across the street from Johns Hopkins Hospital.

The joint venturers, being in the mechanical as well as in the general contracting business, were able to make their own estimates of costs without the need of outside expert help.

Sometime in 1961 a representative of Johns Hopkins University approached Elderkin with an offer to purchase the property.

On April 20, 1961, a portion of the Old Sinai Hospital was sold to the Children's Rehabilitation Institute for $175,000. On September 13, 1961, the remaining portion of the Old Sinai Hospital was sold to Johns Hopkins University for $680,000.

Of the $708,000 purchase price for the Old Sinai Hospital the joint venturers allocated $633,221.52 to the buildings and other depreciable property.

Paragraphs 19, 20, and 21 of the stipulation of facts are as follows:

19. If this Court determines that a deduction for depreciation is proper in this case, the amount claimed on the joint venture returns for the years 1960 [$11,609.05] and 1961 [$8,358.54] as depreciation [a total amount of $19,967.59] represent the proper amounts to be allowed.

20. If this Court determines that depreciation is a proper deduction in this case, then the amount of gain on the sale of the Sinai property as shown on the joint venture return for the year 1961 [$162,859.44] is the proper amount of the gain.

21. If this Court determines that depreciation is not a proper deduction in this case, then the amount of gain on the sale of the Sinai property is $142,891.85 [$162,859.44 less 19,967.59], the amount determined by Respondent in his notice of deficiency.

The joint venturers never advertised the property for sale, never placed a "For Sale" sign on the property, and never placed or listed the property for sale with a real estate agent, broker, or dealer.

Petitioner was not during the years in issue and has never been a real estate agent, broker, or dealer. Elderkin and Cox were not during the years in issue real estate agents, brokers, or dealers. Petitioner and his cojoint venturers never abandoned their intention to convert the property into income-producing property.

Petitioner, when he purchased the property, did not have the intention of selling it immediately.

Petitioner did not buy or sell any other property during the years in issue. Other than the property in issue and his residence, petitioner has never sold any real property.

Lloyd E. Mitchell, Inc., the corporation of which petitioner was president, did occasionally buy and sell real estate from 1944 through

1959, in addition to its regular mechanical and acoustical contracting business. As of June 30, 1960, and June 30, 1961, the outstanding capital stock of this corporation consisted of 20,187 and 20,713 shares, respectively. Of these outstanding shares, petitioners owned 5,268 and 5,074 shares, respectively, in the following proportions:

| Petitioner | As of June 30— | |
| --- | --- | --- |
| | 1960 | 1961 |
| George W. Mitchell | 4,192 | 4,116 |
| Marie J. Mitchell | 1,076 | 958 |
| | 5,268 | 5,074 |

The joint venture in its partnership returns for 1960 and 1961 claimed deductions for depreciation on the property of $11,609.05 and $8,358.54, respectively. The respondent in his determination of the deficiencies disallowed these claimed deductions.

For 1960 the joint venture reported no income and for 1961 it reported income for interest received of $3,328.50.

In addition to the disallowance of the claimed deductions for depreciation, the respondent determined that the gain upon the sale of the property was not entitled to capital gains treatment.

### ULTIMATE FINDINGS

The Old Sinai Hospital property was not held by the joint venturers "primarily for sale to customers in the ordinary course of * * * trade or business" as that phrase is used in section 1221, I.R.C. 1954. It was held "for the production of income" as that phrase is used in section 167(a)(2), I.R.C. 1954.

### OPINION

The first issue relates to the gain realized by the joint venture in 1961 from the sale of the Old Sinai Hospital property and whether that gain is taxable as ordinary income or capital gain. Under section 1221, I.R.C. 1954,[2] the property sold qualifies as a "capital asset," the gain from the sale of which is taxable as capital gain, unless it is excluded from the definition of that term because it constitutes "property held by the taxpayer [the joint venture] primarily for sale to customers in the ordinary course of his [the joint venture's] trade or business." The question presented is one of fact. *Louis Lesser*, 42 T.C. 688, 702–703.

---

[2] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

Numerous factors and criteria have been mentioned by this Court as well as other courts which are pertinent. Such factors as the purpose or reason for the acquisition of the property; the continuity of sales, the number and frequency of sales; the extent to which the taxpayer has engaged in sales activities by developing or improving the property, soliciting customers, and advertising; the obtaining of the services of a real estate agent, broker, or dealer to aid in the disposition of the property; and the taxpayer's status as a real estate agent, dealer, or broker. See *James G. Hoover*, 32 T.C. 618, 625; *Wellesley A. Ayling*, 32 T.C. 704, 709; and *Ralph J. Oace*, 39 T.C. 743, 746–747. None of the aforestated factors alone can be regarded as determinative of the issue. The question must be decided after consideration has been given to all the pertinent factors and particular attention must be given to the facts of the instant case. *W. T. Thrift, Sr.*, 15 T.C. 366, 369.

Regarding the acquisition of the property, the evidence is clear and uncontroverted that petitioner bought the property as an investment. He realized the bidding was low and felt that the property, if it could be purchased at this price, would make a good investment. There is clear evidence in the record that he did not buy with the aim of immediately reselling the property. This is shown by his refusal to take a possible profit on the property seconds after the bidding ceased. However, under the circumstances of this case, if petitioner had acquired the property with an intention to resell immediately, that intent alone would not put petitioner in the real estate business. In *Wellesley A. Ayling, supra*, where we held for the taxpayer, we said:

> The primary thrust of respondent's argument, and our attention, is directed to the fact that the property here in issue was in the first instance purchased by petitioners with the express intention of reselling it. Petitioners do not deny this—to the contrary, they are the first to say that they did not want the property and that at the time of purchase their financial circumstances dictated disposal in the most expeditious manner possible. This circumstance, however, is not in itself controlling. * * *

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> We recognize that the cases in which it was held that the property under consideration was not held primarily for sale to customers do not usually involve property which the taxpayer intended to resell immediately after purchase. However, neither do the cases compel a finding of "business" due to the existence of such an intent. Each case must be decided on the consideration of all the factors involved. * * *

As to the continuity and frequency of sales, the joint venturers bought one piece of property and sold one piece of property. This was the only purchase and sale, not only for the venture, but also for petitioner. Clearly, this does not show the necessary continuity or frequency to establish a "trade or business." See *Wellesley A. Ayling*,

*supra* at 709; *W. T. Thrift, Sr.*, *supra* at 371; and *Ralph J. Oace*, *supra* at 748. Petitioner's business was not that of a real estate agent, broker, or dealer. The same is true regarding Elderkin and Cox. The business of all three of the joint venturers was that of being a corporation executive. The purchase and sale of the Old Sinai Hospital property were nothing more than isolated transactions in the lives of these individuals.

Respondent throughout the entire trial, over the continued objection of petitioner, tried to show that the corporation, Lloyd E. Mitchell, Inc., of which petitioner was a stockholder and officer, was engaged in the real estate business, and that the real estate activities of the corporation should be imputed to petitioner. Although petitioner strongly denied that Lloyd E. Mitchell, Inc., was in the business of buying and selling real estate, such a fact, if true,[3] would be immaterial and irrelevant to the issue in the instant case. *Ralph E. Gordy*, 36 T.C. 855. In that case we said:

Respondent's argument ignores the corporate entities of which petitioner was merely an executive officer. It attributes the corporation's sales of lots to individual purchasers, to petitioner. * * * Petitioner's business was that of a corporate executive. There is no justification for imputing the real estate activities of the many corporations he owns, or controls, to him. Such transactions as are here involved might be vulnerable to a conflict-of-interest charge against the corporate executive but they furnish no grounds for holding the corporation's business is the executive's business.

The separateness of the corporate officer's business and the business of the corporation he represents has long been recognized. *Burnet* v. *Clark*, 287 U.S. 410; *James D. Jarvis*, 32 T.C. 173.

In summary, what we have here is a single purchase of a piece of property, and the formation of a joint venture of three individuals who have never before, nor since, joined in such a relationship. We have no sales activities, no sales "to customers" as that term is used in the statute, *George R. Kemon*, 16 T.C. 1026, no advertising, no soliciting, no development of the property, the complete absence of real estate dealers, brokers, and agents. In short, there is the complete absence of any factor which would or could possibly detract from the instant property's being a capital asset in the hands of the joint venture. On the basis of our ultimate finding, we hold that the gain from the sale of the property should be treated as capital gain and not as ordinary income. *Malat* v. *Riddell*, 383 U.S. 569; *Malat* v. *Riddell*, — F. Supp. — (S.D. Cal. May 6, 1966); *Frieda E. J. Farley*, 7 T.C. 198;

---

[3] It may be interesting to note that, after the instant case was tried, the U.S. District Court for the District of Maryland (Thomsen, C.J.) handed down its decision in *Lloyd E. Mitchell, Inc.* v. *United States*, 259 F. Supp. 345 holding, in a well-considered opinion, "that the real estate sold by taxpayer [the corporation in which petitioner herein is a stockholder and officer] in 1958 and 1959 was not being held primarily for sale to customers in the ordinary course of its business, and that the gains from such sales should be treated as capital gains and not as ordinary income."

*W. T. Thrift, Sr., supra; Ralph E. Gordy, supra; Ralph J. Oace, supra; Louis Lesser, supra.*

The applicable statute under the second issue is section 167 (a) (2), I.R.C. 1954.[4] The term "held for the production of income" is not defined in section 167, nor is it defined in the regulations promulgated under said section. However, the phrase "held for the production of income" was introduced into the tax law in 1942. The Revenue Act of 1942, sec. 121, amended section 23 (a) and (1) of the 1939 Code. Section 23 (a) was amended by adding paragraph (2), which allowed for the deduction of nontrade or nonbusiness expenses incurred for the maintenance, management, or conservation of property held for the production of income. At the same time, section 23 (1) was amended to allow for the deduction of depreciation on property "held for the production of income." Section 23 (a) (2) is the forerunner of section 212, I.R.C. 1954.

The Committee reports accompanying the Revenue Act of 1942 make it clear what Congress intended by the phrase "held for the production of income." Both the House Committee [5] and the Senate Finance Committee [6] had this to say:

> The term "income" for this purpose comprehends not merely income of the taxable year but also income which the taxpayer has realized in a prior taxable year or may realize in subsequent taxable years, and is not confined to recurring income *but applies as well to gain from the disposition of property.* Expenses incurred in managing or conserving property held for investment may be deductible under this provision even though there is no likelihood that the property will be sold at a profit or will otherwise be productive of income. * * * [Emphasis supplied.]

Regulations have been promulgated under section 212, I.R.C. 1954, which incorporate and accept Congress' interpretation of the word "income." Section 1.212–1 (b), Income Tax Regs., in defining the term "income," states it "is not confined to recurring income but applies as well to gains from the disposition of property."

Not long after the passage of the Revenue Act of 1942 this Court had the opportunity to interpret the term "income" as used in the newly amended section 23 (1) of the 1939 Code. In *Mary Laughlin Robinson,* 2 T.C. 305, a Court-reviewed opinion, this Court held that the term "income" includes gain from the disposition of property. At page 308, we said: "The petitioner was clearly holding the property for sale—attempting to sell it—so was holding it for production of income from

---

[4] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

\* \* \* \* \* \* \*

(2) of property held for the production of income.

[5] H. Rept. No. 2333, 77th Cong., 1st Sess. (1942), 1942–2 C.B. 372, 430.

[6] S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 571.

gain from sale." Accordingly, depreciation was allowed the taxpayer in the cited case.

As stated earlier, although the term "income" as used in section 167, *supra*, as part of the phrase "held for the production of income" is not defined, we see no reason why its meaning should be any different from the meaning expressed by Congress and adopted by the Commissioner for the same word and phrase contained in section 212, especially when the two phrases are identical and came into existence at the same time and for the same reason.

In *May* v. *Commissioner*, 299 F. 2d 725 (C.A. 4, 1962), affirming 35 T.C. 865, the Fourth Circuit cited with apparent approval two of our Memorandum Opinions, in which we followed *Mary Laughlin Robinson, supra.*[7] See also *Briley* v. *United States*, 189 F. Supp. 510, 514 (N.D. Ohio 1961) ; and *William C. Horrmann*, 17 T.C. 903.

We hold for the petitioners on this issue.

Since the entire deficiencies were not contested,

*Decision will be entered under Rule 50.*

---

[7] In the *May* case, the court said, in part: "the tax law recognizes that certain kinds of property held for sale without more may qualify for the [depreciation] deductions. Helene I. Fagan, 9 CCH Tax Ct. Mem. 44 (1950) ; Anna C. Newberry, 4 CCH Tax Ct. Mem. 262 (1945)."