Robert E. Ronhovde and Valaretta Ronhovde v. Commissioner.
Ronhovde v. Commissioner
Docket No. 4553-66.
United States Tax Court
T.C. Memo 1967-243; 1967 Tax Ct. Memo LEXIS 17; 26 T.C.M. (CCH) 1251; T.C.M. (RIA) 67243; December 7, 1967
Robert E. Ronhovde, pro se, 432 Highland Dr., Gretna, Neb. Roy S. Fischbeck, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the petitioners' income tax for the calendar year 1963 in the amount of $951.27. Some of the issues raised in the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: Whether $5,000 received by petitioner Robert E. Ronhovde as his distributive share of the gain by a partnership realized from the sale of a 188-acre tract of farmland to a corporation in which the partners held an interest of approximately 30 percent is taxable as long-term capital gain or ordinary income. Findings of Fact *18 Some of the facts have been stipulated and are found accordingly. Petitioners, Robert E. and Valaretta Ronhovde, are husband and wife, who resided at the time of the filing of the petition in this case in Gretna, Nebraska. Petitioners filed a joint Federal income tax return for the calendar year 1963 with the district director of internal revenue, Omaha, Nebraska. Robert E. Ronhovde (hereinafter referred to as petitioner) as the managing partner of Gretna Land Partnership filed a partnership return of income (Form 1065) for that partnership for the calendar year 1963 with the district director of internal revenue, Omaha, Nebraska. Petitioner for several years prior to 1963 had been and has continued to be in the promotion business, including the selling of oil well promotions. During the years 1961 and 1962 petitioner had been looking at land between Omaha and Lincoln, Nebraska, because he considered the area one which might develop, causing the land to appreciate in value. In late 1961 petitioner became interested in purchasing a 188-acre tract of unimproved farmland in Sarpy County, Nebraska, situated on U.S. Highway 6, 1 mile north of the city of Gretna. This land *19 is located between Omaha and Lincoln, Nebraska. It is 15 or 20 miles southwest of Omaha and within approximately a 35 minute drive from Lincoln, Nebraska. When petitioner became interested in this land it was owned by Howard C. Krambeck (hereinafter referred to as Krambeck). During 1962 petitioner talked with Krambeck several times and in the fall of that year Krambeck orally agreed to sell the farmland to petitioner for $100,000 with a cash downpayment of $10,000. Shortly after petitioner obtained Krambeck's oral agreement to sell him the farmland, he began to discuss with some of his relatives his idea for forming a partnership to purchase the farmland. This partnership was to acquire cash by means of capital contributions, which cash would be used to the extent of $10,000 for the downpayment necessary to purchase the farmland. In December of 1962 petitioner, his father, John Ronhovde, Sr., his brothers. John A. Ronhovde and Arthur D. Ronhovde, and his brothers-in-law, John M. Berry and George M. Sorensen, orally agreed to form a partnership to be known as Gretna Land Partnership, which partnership would purchase the farmland. In late December 1962, after the oral agreement *20 had been reached with respect to the formation of the partnership, petitioner began to consider the sale of the property to a developer and then decided that he might promote an entity to develop the farmland the partnership was planning to purchase or other land between Omaha and Lincoln. Petitioner considered the promotion of a corporation to engage in the development business and contacted persons in the state securities department in Lincoln to determine the necessary steps to form such a corporation. During January and early February 1963 petitioner talked with his relatives who were the partners in Gretna Land Partnership about his idea for a corporation but no definite agreement was reached as to whether these relatives would subscribe for stock in the corporation. Also in late January or early February 1963 petitioner had certain forms printed for use in sales of corporation stock to form a corporation to be known as Commuter Developments and Investments, Inc. Petitioner had these forms printed at his own expense and without obtaining the consent of the other partners of Gretna Land Partnership. On January 29, 1963, the partners entered into and executed a written agreement *21 which had been prepared for them by an attorney, entitled "Partnership Agreement" which states in part: WHEREAS, there are certain investors who desire to purchase certain real estate and further desire to pool their resources in a Partnership to purchase said property, NOW, THEREFORE, the following is agreed: 1. Name and Business. The name of this Partnership shall be the "Gretna Land Partnership". It shall engage in the business of acquiring certain real estate near Gretna, Nebraska and holding said real estate with the expectation that it will appreciate in value. The Partnership shall also conduct such other business as the partners may from time to time agree upon. * * *
3. Capital. The capital contribution of each of the partners shall be as is indicated below and their respective percentage interests shall also be as is indicated below: Percentage
Interest in
Capital
Partner-
Name of Partner
Address
Contribution
ship
John Ronhovde, Sr.
Route 7, Lincoln, Nebraska
$ 3,000.00
20.000%
Robert E. Ronhovde
1801 Mayfield, Omaha, Nebraska
5,000.00
26.667
John A. Ronhovde
Route 7, Lincoln, Nebraska
2,000.00
13.333%
John M. Berry
Route 7, Lincoln, Nebraska
$ 2,500.00
16.667%
George M. Sorensen 331 So. 30th, Lincoln, Nebraska
500.00
10.000%
Arthur D. Ronhovde
2165 No. Main St., Fremont, Ne-
braska
2,000.00
13.333%
Total
$15,000.00
100%
*22 All future capital contributions, unless changed by the partners, shall be contributed in the percentage interests of the respective partners indicated above. 4. Profit and Loss. The net profits and losses of the Partnership shall be divided in the same percentages as is indicated in Paragraph 3, above. Provided, however, that if there should be a change in the capital contributions, then the partners' percentages of net profits and losses shall be changed accordingly. 5. Management. The purpose of this Partnership is to acquire certain farm land in Sarpy County, Nebraska, for $100,000.00. The terms and conditions of said purchase and the legal description of said property are described in a certain Agreement attached hereto as Exhibit A. Recognizing that it was Robert E. Ronhovde who found this opportunity and who to date has done all of the negotiations for the purchase of said property, it is agreed that said partner will function as the Managing Partner of this Partnership. For the purpose of simplifying the transfer of title to said property, it is agreed that the real estate contract and deeds to said property may be held in the name of Robert E. Ronhovde as a nominee *23 for this Partnership. * * * 6. Salaries and Drawings. It is agreed that the Managing Partner shall set aside an amount of $5,000.00 for organization expenses which shall be used to pay all expenses connected with the proposed acquisition and a salary to the Managing Partner. Other than this amount, no other salary shall be paid to the Managing Partner or to any other partner. * * *
On February 7, 1963, Krambeck and his wife, and petitioner, as managing partner and nominee of the partnership, entered into and executed a written agreement entitled "Real Estate Contract" which provides in part: * * *
1. Purchase Price. For a total purchase price of one-hundred thousand dollars ($100,000.00), the Sellers hereby sell to the Buyer and the Buyer hereby purchases from the Sellers the following described real estate in Sarpy County, Nebraska: * * * 2. Chart of Payments and Transfers. Said purchase price shall be paid as follows and acres shall be conveyed, mortgaged, or released from the mortgage, whichever is applicable, as follows: No. of
Acres
Con-
Mort-
Re-
Date -
Payments
veyed
gaged
leased
1. Signing of Contract
$ 10,000
4
2. On 12/1/63
19,000
16
3. On or before 12/1/64
15,000
20
40
Additional acres conveyed with Payment #3
148
148
4. On or before 12/1/65
14,000
(15)
15
5. On or before 12/1/66
14,000
(25)
25
6. On or before 12/1/67
14,000
(25)
25
7. On or before 12/1/68
14,000
(83)
83
Totals
$100,000
188
0
148 * * *
*24 6. Selection of Acres. It is the intention of the Sellers and the Buyer that the real estate subject to this Contract be developed in an orderly manner. Therefore, it is agreed that said property will be divided in three parcels, to be known as Parcels 1, 2, and 3. After making the payments as are provided for in this Contract, the Buyer, in his complete discretion, can choose which acres within Parcel 1 he desires the Sellers to convey or release, whichever is applicable. After the Buyer has received title or a release for all of the acres in Parcel 1, he can then, in his complete discretion, choose which acres he desires the Sellers to convey or to release to him in Parcel 2. Similarly, after the Buyer has received title or a release to all of the acres in Parcel 2, he can then, in his complete discretion, choose the acres he desires the Sellers to convey or release to him in Parcel 3. Although the Buyer shall have the unlimited right to choose acres within a Parcel, he cannot choose acres in Parcel 2 until he has received title or a release to all of the acres in Parcel 1, and cannot choose acres in Parcel 3 until he has received title or a release to all of the acres in Parcels *25 1 and 2. * * * 7. Possession. The Buyer shall have possession of four (4) acres to be selected by him in Parcel 1 when this Contract is executed and Payment #1 is made by the Buyer. The Buyer shall have possession of the balance of said property on December 1, 1963. * * *
10. Assignment. This Contract may be assigned by either the Sellers or Buyer. * * *
Immediately after the partnership purchased the farmland, petitioner wrote and posted a letter dated February 7, 1963, to the partners in which he stated in part: Gretna Land Partnership closed the deal and made first payment of $10,000.00 on the farm at 10:33 a.m., Thursday, February 7, 1963. Forms are all printed and ready to use in sales of corporation stock to create Commuter Developments and Investments, Inc., to whom we will sell the land six months hence. On the date the partnership purchased the farmland it was being used as farmland and there were no improvements on it. On February 23, 1963, petitioner wrote and posted to the partners a letter to which was attached a preliminary plat and in which he stated in part: Partners: In talking to people, the first question asked seemed to be how will *26 it be developed. This was hard to explain in words, hence the enclosed Preliminary Plat. This is answering the questions quite satisfactorily. Vern Dopp is already selling some stock. This surprised me a little. I thought we would have to be rolling a little better before he could hack it. This stock is being very favorably received by most of our old oil investors, however, * * * We now have a total of 25 stock subscribers. Some are not firmly committed to specific dollars, but the total would be about $50,000.00. March should be a big month for stock sales. Petitioner prepared the plat attached to this letter himself in a few hours time by tracing over an aerial plat graph. The corporation's first subscription agreement was obtained about the middle of February 1963 and the partners of Gretna Land Partnership were first specifically solicited for stock subscriptions in March of 1963. On April 4, 1963, petitioner wrote and posted or personally delivered to the partners a letter stating in part: Partners: * * *
Interest from the advertisements in the local papers has not come through as was expected. Looks like we'll have to work a litte harder. I have been keeping *27 busy with other angles this past month however, and will now get busy on the stock sales a little more. By other angles, I mean checking on what we may want to do in the way of actually getting into construction and development work from the contractor's angle. There is a lot of money to be saved and made in doing our own General Contracting. I am planning now to build a couple of houses out by Hermans on the 5 acres I have there. I may also handle the building of my own home at Gretna. Sales are at about $70,000.00 now * * *. It was not intended for the partnership to enter the contracting business but rather to have the corporation enter that business. On May 12, 1963, petitioner wrote and posted a letter to John M. Berry, a partner and petitioner's brother-in-law. At this time John Berry was in the armed forces. The letter stated in part: Dear John and Caroline: John, Congratulations on your promotion. I understand that as a result of this you expect to be moved shortly. * * *
Things are moving along ok, we are standing now with about 50 stockholders. It is possible that we may wind it up with these. We are going back now to offer all of them additional stock with *28 20% of it payable now and the balance not due until August 1, 1964. (copy of contract enclosed) * * * You said when we were down that you wanted to leave your initial 2,500 plus profit in the corporation and possibly would want some additional stock. I imagine many of your plans will be altered with your new service status. I wonder if you know what your wishes will be now in this regard. I will have to know from all the partners soon on this so that I will know now much stock to place with others. I intend, with the delayed subscription, to hold 1,000 shares myself. Sincerely, Bob P. S. I ran a little want-ad in the Sunday only a couple of weeks ago for acres for sale to check interest. Got about 20 XXX phone calls. We can start selling as soon as we can start surveying out lots. An August 5, 1963, the Articles of Incorporation of Commuter Developments and Investments, Inc., were filed of record pursuant to and in accordance with the laws of the State of Nebraska. At the time the Articles of Incorporation were filed subscriptions to the corporation's stock had been obtained from 74 persons unrelated to the partners of Gretna Land Partnership so that there were initially 80 *29 shareholders, the six partners, plus the 74 others. All 80 subscribers to the corporate stock signed the Articles of Incorporation. The partners were promoters of the corporation and the first signers of the incorporation papers which they had signed prior to agreeing to the purchase of a specific amount of stock. They did not definitely agree to the amount of stock they would purchase until August 5, 1963, the date the Articles of Incorporation were filed. The initial stock subscription accounted for the issuance of 7,960 shares valued at $10 per share with the six partners acquiring approximately 30 percent of the shares each subscribing to and receiving the number of shares indicated below: Shares
John Ronhovde, Sr.
200
Robert E. Ronhovde
1,000
John A. Ronhovde
250
John M. Berry
500
George M. Sorensen
225
Arthur D. Ronhovde
225
2,400
The six partners each used his return of investment and profit from the sale on September 11, 1963, of the farmland to the corporation for $128,200 in payment for stock of the corporation. The cost of the farmland to the partnership was considered and treated by the partners to be $113,200, based on the following *30 apportionment, the last two items representing compensation to petitioner and the second item primarily representing compensation to petitioner. $100,000.00 - Purchase price. $5,000.00 - Organizational expenses of partnership, including land acquisition expenses and salary paid to petitioner as managing partner. $6,000.00 - Commission paid to petitioner for sale of farmland to Commuter Developments and Investments, Inc. $2,200.00 - Four acres of the purchased farmland valued at $550.00 per acre and given to petitioner for services rendered. The price to be paid by the corporation for the farmland was determined by consideration of a reasonable appreciation of the land for the period of time it had been held by the partnership. The condition and use of the farmland on the date the partnership sold it to the corporation was the same as on the date the partnership purchased it except that the petitioner had commenced digging a basement for a house on the land he received as compensation. The partnership acquired no land other than the farmland acquired on February 7, 1963, and has engaged in no other transaction of any kind, although there has been no formal dissolution *31 of it. In forming the corporation Commuter Development and Investments, Inc. petitioner intended for the corporation to acquire and develop the farmland purchased by the partnership if agreement with the other partners as to price could be reached and the corporation could raise sufficient capital to purchase and develop a piece of land of that size. If the corporation could not raise sufficient funds to purchase and develop the farmland which had been purchased by the partnership, petitioner as promoter of the corporation intended for the corporation to purchase and develop a small tract of land in the area between Omaha and Lincoln, Nebraska. Originally the corporation engaged only in the purchase and development of land but as of early 1967 had also gone into other operations. The partnership Federal return of income for the year 1963 reflects its sale of the farmland for $128,200 and its cost thereof as $113,200, leaving a resulting net gain of $15,000, which was reported as a capital gain distributed among the copartners, $5,000 being distributed to petitioner. Petitioners on their joint Federal income tax return for the calendar year 1963 reported this $5,000 distributive share *32 of the partnership gain as a long-term capital gain. Respondent recomputed petitioners' tax liability for the calendar year 1963 by treating their $5,000 distributive share of the partnership gain on the sale of land as ordinary income instead of capital gain because of considering that the partnership held the farmland primarily for sale to customers in the ordinary course of its trade or business within the meaning of section 1221(1) of the Internal Revenue Code of 1954. [1]
Opinion In accordance with the statement by respondent's counsel at the trial of this case and on brief that the issue is whether the farmland sold by Gretna Land Partnership *33 to Commuter Developments and Investments, Inc., was a sale of property held by the partnership primarily for sale to customers in the ordinary course of the trade or business of the partnership, we will limit our consideration to that issue. [2]
If, as respondent contends, the farmland was property held by the partnership primarily for sale to customers in the ordinary course of the partnership's trade or business, then the gain realized upon the sale of the land by the partnership would be ordinary income to the partnership and the distributive share of each partner would be ordinary income to the partner. Section 1221(1), I.R.C. 1954; Section 702(b), I.R.C. 1954. In considering the narrow issue here presented a summary of the facts is helpful to put the various entities involved in proper perspective. Petitioner is a promoter. This has been his business for a number of years. When petitioner found the farmland with which we are here concerned and obtained an oral commitment from the owner to sell *34 it, he decided to and did persuade his relatives to share in the purchase of the land. For this purpose petitioner formed a partnership with these relatives. In sustance petitioner's relatives contributed the $10,000 needed for the downpayment on the land and petitioner the $5,000 which under the agreement he was to and did receive for organizational expenses of the partnership including expenses connected with the acquisition of the land and as his salary as managing partner. Having obtained agreement from his relatives to make as partnership capital contributions the $10,000 needed as a downpayment on the farmland, petitioner began to consider making a sale of the property for the partnership. Petitioner conceived the idea of promoting a corporation to buy and develop the partnership property. To promote such a corporation would be advantageous to him, both by the creation of a customer for the farmland which the partnership was to purchase and by giving him the opportunity to obtain an investment in a land development corporation. Petitioner began the promotion of a corporation with the intent, if posible, to raise sufficient funds through stock sales to buy the partnership's *35 farmland by taking an assignment of the contract which he had made for the purchase of the land as managing partner of the partnership and proceed with the development of the land. To carry forward this idea, petitioner attempted to and did persuade his relatives who were partners in the Gretna Land Partnership to subscribe for stock in the corporation. He worked out a plan whereby his relatives could pay for their stock by letting the amount they otherwise would have received for the farmland go in whole or in part for the purchase of the stock. Petitioner, himself, took stock for his full portion of return of investment and gain on the sale by the partnership of the farmland. His brother-in-law, John M. Berry, did likewise. The other partners of the Gretna Land Partnership took part stock and part cash, except George M. Sorensen, who apparently, from the amount of his capital contribution to the partnership and percentage interest in the partnership, must have paid cash for 25 shares of corporate stock. Because of the amount of money it was necessary for the corporation to raise to go forward with the purchase and development of the land it was to acquire from the partnership, petitioner *36 had to sell stock to 74 persons unrelated to the partners in the Gretna Land Partnership. The six partners owned only approximately 30 percent of the stock of the corporation. It was petitioner's hope that he could sell enough stock for the corporation to purchase the farmland from the Gretna Land Partnership and that he could make satisfactory arrangements with the other partners of the partnership to carry out the purchase. Whether sufficient stock in the corporation could be sold to cash subscribers to finance such purchase and development was not and could not be known until shortly before August 5, 1963, when the Articles of Incorporation of the corporation were filed. Respondent has made no argument attacking the three separate entities concerned with the transaction here in issue. Respondent recognizes the partnership as a separate entity, the corporation as a separate entity, and petitioner as an entity separate from either the partnership or the corporation. Respondent makes no contention that the $5,000 which petitoner reported as capital gain was in some way compensation to him from the partnership or some form of promotional fee from the corporation, nor does respondent *37 contend that because petitioner's business was that of a promoter, any gain or loss in connection with his various promotions would be ordinary income or loss and not capital gain or loss. We are not, therefore, concerned with any of these questions. It might also be worth noting that at the trial of this case petitioner, who is not a lawyer, stated in effect that he could not understand how any "gain" resulted from the transaction here involved since all that happened as far as he was concerned was that he turned over his partnership interest in the contract to purchase land to the corporation for stock and he was still waiting for any "gain." He explained that some of the other "partners" did not leave all their "profit" in stock but took some stock and some cash. If petitioner was suggesting by these statements that what occurred here was a tax-free exchange by him or by the partnership of the contract to purchase the farmland for stock in the corporation, we do not consider such an issue to be properly before us in this case. The partnership and petitioner reported the transaction whereby the contract for the purchase of the farmland was assigned to the corporation as a sale of *38 the farmland, resulting in a capital gain, and in their petition in this case petitioners made no allegation that the transaction should be considered to be other than the sale of a capital asset. Although Gretna Land Partnership had a formal partnership agreement, in substance it was more nearly a joint venture than a partnership since it was formed for the purpose of buying the 188-acre tract of farmland and the purchase and sale of this farmland is the only transaction in which it ever engaged. The parties stipulated orally at the trial that all the partners of Gretna Land Partnership were promoters of the corporation. However, petitioner testified that Sorensen was the only one of the other partners who assisted him in any way with organizing and promoting the corporation except that the other partners agreed to take all or some part of their proportion of the payment for the farmland in stock of the corporation and to be the first persons to sign the articles of incorporation. Another fact that is clear from the record in this case is that at no time was it the plan of the partners in the Gretna Land Partnership either to develop the land themselves or have the partnership *39 develop the land. Although the land was purchased because it was good land for a subdivision, and the obvious purpose of the provision in the contract for its purchase for release of portions of the land upon payment of portions of the purchase price was to facilitate its use as land for a development, the plan from the beginning was that the land would be sold by the partnership to a person or corporation in the development business. It was in connection with considering who might be a prospective purchaser for the land that petitioner conceived the idea of promoting a corporation to buy and develop the land. There have been numerous cases involving the question of whether land was held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business. In most of those cases the taxpayer either had developed or improved the land in some manner or the taxpayer had been in the business of developing land and the issue in the case centered on whether it was his intent at the time of purchase or some later time while he held the land involved but prior to its sale as unimproved property to develop that particular land in the ordinary course of his land development *40 business. There have been few cases in which the contention has been made that the sale of one parcel of land was not the sale of a capital asset where the taxpayer who made the sale had in no way improved or developed the land while he held it and had never at any time engaged in any other transaction connected with the sale, development or improvement of real property. We have found no case of the isolated sale of one piece of unimproved land with facts comparable to those in the instant case. The facts, as we have set them forth, show unmistakably that the partnership acquired the farmland and held it for sale. The problem here is whether the land was held for sale by the partnership in the ordinary course of the partnership's "trade or business." Petitioner as a promoter of the corporation was suggesting how this farmland might be platted and subdivided and how the corporation might operate by doing its own general contracting work even before the corporation was actually in existence. The record, however, shows that all of these activities were done by petitioner as promoter of the corporation or on behalf of the corporation and not as managing partner of the partnership. Even *41 petitioner's efforts at interesting his relatives who were partners in Gretna Land Partnership in subscribing to stock in the corporation and leaving their distributive share of the partnership's receipts from the sale of the land to the corporation as a stock investment in the corporation was to a large extent in connection with his activities as a promoter of the corporation. To some extent these activities might be considered as activities in his capacity as managing partner of the partnership in that it would enable him perhaps to effect a more favorable sale of the land to the corporation if the partners did not demand cash payment. Therefore, to some extent petitioner as managing partner was conducting activities on behalf of the partnership which might be viewed as a "business" of the partnership in selling its one piece of property, the tract of farmland. However, when this activity is viewed in the light of the various criteria land down in other cases which do not have the very unusual facts of this particular case, it does not meet the normal definition of "a trade or business" as distinguished from efforts to dispose of an investment. As we pointed out in James G. Hoover, 32 T.C. 618, 629 (1959), *42 "* * * Buying non-income-producing realty to hold for expected rise in value is much like investments in the stock market where stock is purchased purely as an investment, not upon the theory that it will produce immediate income, but that it has growth value." Generally, in the cases where it has been concluded that even though property was held for sale, such property was not held for sale to customers in the ordinary course of the taxpayer's trade or business, the factual situation has been one where for some reason it was necessary for the taxpayer to acquire more land than he wanted for a personal use and in order to obtain the best price for the land which he did not intend to retain at the time it was purchased, such land would be divided and sold in varying numbers of small lots or parcels. See, for example, Wellesley A. Ayling, 32 T.C. 704 (1959), and Ralph J. Oace, 39 T.C. 743 (1963). As we pointed out in Wellesley A. Ayling, supra, at page 708, there are a large number of cases with a variety of circumstances dealing with the question of *43 whether a taxpayer held real property for sale to customers in the ordinary course of his trade or business. We there pointed out that "[among] the matters usually considered are the taxpayer's purpose in acquiring and disposing of the property; the frequency and continuity of sales or salesrelated activity; and the owner's activities in developing and selling the property." We then called attention to the fact that respondent's argument was primarily directed to the fact that the taxpayers in that case had purchased the property involved with the expressed intention of selling it, a fact which the taxpayers did not deny. We concluded, however, that such circumstance was not in itself controlling. In that case we recognized that usually the cases in which we held that the property under consideration was not held primarily for sale to customers in the ordinary course of a taxpayer's trade or business did not involve property purchased by a taxpayer with the intent to sell it immediately after purchase, but we there concluded that those cases did not require a finding that such property was *44 sold in the ordinary course of a taxpayer's trade or business because such an intent did exist at the time the property was purchased. We stressed the fact that the taxpayers in that case had acquired the property for reasons totally unrelated to embarking on a business venture. The primary differences between Wellesley A. Ayling, supra, and the present case are that the partnership had no reason for acquisition of the farmland it acquired aside from the profit which might be made upon its sale, whereas the taxpayers in the Ayling case had to take extra property along with the purchase of a house which they desired to use for a home, and the fact that the taxpayers in the Ayling case platted the tract which they owned themselves and divided it into 14 parcels, of which they sold 13, whereas the partnership in the instant case sold the property in the same form in which it was acquired and at no time had any intent of developing the property itself or through some agent. To what extent the fact that the property was acquired to sell at a profit should persuade toward a conclusion that such property was held for sale in the ordinary course of a trade or business, as *45 distinguished from being held as the partnership agreement stated it was for sale after the property had appreciated in value, has not been the precise issue in any case to which our attention has been directed. Somewhat related issues were involved in Morris Cohen, 39 T.C. 886 (1963), and George W. Mitchell, 47 T.C. 120, (1966), in each of which we held a one-time transaction not to result in ordinary income but to result in capital gain. On the facts of those cases we concluded in each instance that the properties were not held for sale by the taxpayer in the ordinary course of his trade or business. The facts in Morris Cohen, supra, are to a slight extent similar to those in the instant case. In that case a joint venture in one instance and a corporation in the other bought farmland to hold to sell for a profit. Within two years the land in one instance and the stock in the other were sold at a profit. In the Morris Cohen case the sale of the land was made without solicitation by the joint venture. In the instant case, there was no actual solicitation for the farmland sale even though petitioner did promote a corporation to which to sell *46 the land. This is certainly a form of solicitation. Considering all the facts here present, we have concluded that the partnership purchased the farmland as an investment property to be sold when the partnership could obtain an appreciated value for it. We have further concluded that since the farmland was being held to obtain an investment gain, it was not held for sale by the partnership in the ordinary course of a "trade or business." The fact that the sale was made so soon after the land was acquired would militate strongly against our conclusion here, were it not for the fact that the record shows that the reason a favorable sale was possible in such a short period of time was petitioner's promotion of a customer, the new corporation, to buy the land. The question here is basically one of fact. S. O. Bynum, 46 T.C. 295 (1966). While we have considered all the facts in reaching our conclusion, the most persuasive is the fact that the only purchase and sale of land by the partnership and, in fact, the only transaction of any kind engaged in by it was the purchase and sale of this one tract of farmland. While we would not say as an abstract matter that one isolated *47 transaction could never constitute a "trade or business" or that there could not be an "ordinary" course of such a one transaction trade or business, from the facts of this case we do not consider the partnership's one purchase and sale of the tract of farmland to be a "trade or business" or the sale to have been made in the "ordinary course of a trade or business." We sustain petitioner in his treatment of the $5,000 distribution to him of partnership gain on sale of farmland as capital gain but because of the other adjustments in petitioners' tax liability which are not here in issue, Decision will be entered under Rule 50. Footnotes
1. Only the face sheet of the notice of deficiency is attached to the petition in this case and no copy of this notice was otherwise placed in the record, although in paragraphs 21 and 22 of the stipulation of facts reference is made to the "statement attached to the statutory notice of deficiency." However, respondent in his opening statement and on brief limited the issue to the nature of the holding and sale of the land by the partnership and we have therefore considered the issue to be so limited.↩
2. In the opening statement of respondent's counsel and in respondent's brief, this is stated to be the limited issue in this case.↩